Filed 3/17/26  P. v. Grossman CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REBECCA JUNE GROSSMAN,<br><br>    Defendant and Appellant. | B338720<br><br>(Los Angeles County<br>Super. Ct. No. LA093990) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph A. Brandolino, Judge.  Affirmed.

Gressley & Donaldson and Lara Gressley, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Jason Tran and Kristen J. Inberg, Deputy Attorneys General for Plaintiff and Respondent.

The jury found Rebecca June Grossman guilty of two counts of second degree murder (Pen. Code,[1] § 187, subd. (a), counts 1 & 2), two counts of vehicular manslaughter with gross negligence (§ 192, subd. (c)(1), counts 3 & 4), and hit and run driving resulting in death or serious injury (Veh. Code, § 20001, subd. (b)(2), count 5). The jury found true in counts 3 and 4 the allegations that Grossman fled the scene of the crimes. (Veh. Code, § 20001, subd. (c).) The trial court sentenced Grossman to a total term of 15 years to life in prison. The court sentenced Grossman to 15 years to life in count 1 and a concurrent term of 15 years to life in count 2. The court imposed and stayed, pursuant to section 654, a term of 11 years in count 3 (the upper term of six years plus five years for the hit and run enhancement), and a term of 16 months in count 4. In count 5, the court imposed a concurrent term of three years.

On appeal, Grossman contends: (1) the court gave erroneous instructions on implied malice; (2) the evidence was insufficient to establish implied malice and hit and run; (3) the court applied the wrong standard for subjective implied malice in deciding the motion for new trial; (4) the court abused its discretion by admitting character evidence and evidence that was unduly prejudicial; (5) the prosecution improperly argued a theory of guilt in Grossman's trial that was inconsistent with its theory in the prosecution of former codefendant Scott Erikson; (6) the court erred by refusing to suppress statements Grossman made to officers during a custodial interrogation in violation of

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

her *Miranda*[2] rights; (7) the court erred in denying Grossman's request, pursuant to *Franks v. Delaware* (1978) 438 U.S. 154 (*Franks*), for an evidentiary hearing on her motion to traverse the warrant used to obtain a blood sample; (8) the court erred in denying Grossman's motion to suppress blood sample evidence under the Fourth Amendment; (9) the court abused its discretion by excluding evidence that Grossman sought to introduce in her defense; (10) the court erred by finding true the aggravating factor that the victims were particularly vulnerable; and (11) the court abused its discretion by ordering destroyed all identifying information obtained from jurors during voir dire.

We affirm the trial court's judgment.

## FACTS

### A.    *Events Before the Collision*

#### 1.    <u>Background</u>

In September 2020, Grossman was in a romantic relationship with Scott Erickson.  Grossman's husband, Dr. Peter Grossman, was aware of the relationship.  The Grossmans had two residences.  Grossman sometimes stayed in the house where her husband resided in Hidden Hills.  At other times Grossman lived with Erickson in the Grossman's Westlake Village home, which was on Bowsprit Circle off of Triunfo Canyon Road on Westlake Lake.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Between September 20, 2019, and September 29, 2020, Grossman placed 7,533 calls and texts utilizing the cell towers in the general area of the crime scene, which was less than a mile from Grossman's Bowsprit residence.

### 2. Mark Hair

On September 29, 2020, at approximately 4:30 p.m., Mark Hair and his wife invited Grossman to come to their home in Westlake Village. Grossman had called Hair's wife and asked her to meet Grossman and Erickson at Julio's Agave Grill, but the Hairs were already making dinner, so they asked Grossman to come to their house and have a drink instead. When Grossman arrived, Hair made her a margarita containing a shot of tequila. Grossman drank at least half of the margarita before she left the Hair's house at approximately 5:35 p.m. Hair did not know if Grossman finished her drink or not. Several months after the collision, Grossman asked Hair and his wife not to tell anyone that she had a drink at their house before going to Julio's Agave Grill. The Hairs had already provided the information to the police.

### 3. Royce Clayton

At approximately 6:30 p.m., Royce Clayton met Erickson and Grossman at Julio's Agave Grill near Lakeview Canyon Road and Agoura Road in Westlake Village. They all arrived at Julio's separately. Erickson was driving a black Mercedes SUV, and Grossman was driving a white Mercedes SUV. Grossman drank one margarita at the restaurant. Erickson had two margaritas.

4

Grossman, Clayton, and Erickson stayed for about 25 minutes. When they left the restaurant, it was still light outside. They planned to watch the presidential debate together at Grossman's house at 7:00 p.m. Grossman did not appear to be impaired by alcohol when they left. Clayton went to pick up some fish for tacos before going to Grossman's. When he called Erickson to get Grossman's address, Erickson told him that Grossman had been involved in an accident, so Clayton did not go to meet them.

## B. *The Collision*

### 1. <u>Nancy Iskander</u>

In the afternoon on September 29, 2020, Nancy Iskander and her husband Karim Iskander took their four children out to get some fresh air after school. Their oldest child, Mark, was 11 years old, the next child, Jacob, was eight years old, Zachary was five years old, and the youngest child, Violet, was one year old. The Iskanders drove to Triunfo Canyon Road for their outing. Once there, Nancy and Jacob rollerbladed, Mark rode his skateboard, and Zachary rode a scooter. Mark and Zachary were both wearing helmets. Karim pushed Violet in her stroller while he jogged. Karim and Violet went ahead of Nancy and the three boys. Nancy and the boys were all adept at using their respective rollerblades, skateboard, and scooter, and used them often.

Triunfo Canyon Road is a four-lane road with two lanes going in each direction (which we refer to in this opinion as eastbound and westbound).[3] There are bicycle lanes on both

---

[3] Triunfo Canyon Road generally runs southeast and northwest, although it runs north and south near the scene of the

sides of the road, and a center median.  Westlake Lake is located on the east side of Triunfo Canyon Road.  In 2020, people in the neighborhood commonly walked their dogs, biked, jogged, and walked along Triunfo Canyon Road.  People were always recreating in the area.  There were many people out in the evening on September 29, 2020.  The Iskanders traveled south along Triunfo Canyon Road toward Saddle Mountain Drive.  They started out on the west side of the road, further away from the lake.  When the Iskanders got to the lake, they decided that they would cross Triunfo Canyon Road at the Saddle Mountain Drive crosswalk to take pictures and look at the water.  Nancy and the boys waited to use the crosswalk.  When it was clear of traffic, they entered the crosswalk and crossed the eastbound lanes to the median.  Nancy led them and kept the youngest boy, Zachary, closest to her.  Jacob was right behind them, and Mark was right behind him.  Nancy chose the crosswalk because she thought it was the safest way to cross to the lake.  The crosswalk was well-marked and there were signs on the side of the road showing that there was a crosswalk ahead.  Pedestrians did not have to step up onto a curb to cross the median.  The crosswalk interrupted the median so that the pavement was level all the way across the road.

After they crossed most of the first westbound lane, Nancy saw "racing cars."  Nancy had her eyes on the road, so she heard and saw the cars approaching her at the same time.  They were extremely loud.  Nancy testified "two cars [were] coming towards

---

crimes.  We refer to the lane directions as eastbound and westbound to differentiate Triunfo Canyon Road from Lindero Canyon Road, which intersects Triunfo Canyon Road and generally runs north-south.

6

us at an insane, crazy speed . . . like you wouldn't imagine on the highway.  Crazy speed.  They were coming towards us and changing lanes, switching lanes as if they were racing or playing. . . . I freaked—I put my hand up in the air, but it was two seconds until the black car made it to that crosswalk.  Two [SUV's], one black and one white, and the black one was trying to beat the white one or something, and it came towards the crosswalk right—right at Zachary and I, towards Zachary and I exactly.  I was almost, I would say, maybe in the center of that bumper coming towards me."  "They were playing.  I could tell with confidence they were playing.  They were either trying to bait each other to someplace.  They were racing.  I'm not sure what they were doing. . . .  [T]hese were not just two cars driving on the road.  So I can't tell you, you know, which lane they were [in at first] or anything like that.  I'm not describing regular cars.  I'm describing a race track."

Nancy saw the cars perform at least one "zigzag" before reaching the crosswalk—i.e. they changed lanes and then changed back to their original lane.  At the crosswalk, the black car was in the right lane in the lead, coming right at Nancy and Zachary.  Nancy grabbed Zachary off of his scooter and dove into the bicycle lane by the sidewalk on the right (east) side of Triunfo Canyon Road.  The black car passed without hitting anyone.  The white car was in the left lane and went through the crosswalk right after the black car.  The white car crossed where Mark and Jacob had been.  As the white car passed, Nancy heard a loud impact.  Both cars continued driving west, and everything was quiet.

Nancy started screaming.  Bystanders had gathered.  She put Zachary in the arms of a young woman standing on the curb.

7

Initially, Nancy could not find Mark or Jacob.  Nancy found Jacob on the right side of the road first.  He looked like he was sleeping.  She discovered Mark's body much further down the road on the left side with his head resting on the center median.  Nancy knew immediately that Mark was dead.  She went to Jacob and put her head on his chest.  His heart was still beating.  At that point police began arriving.  The police told her Mark was dead and that the person who killed Mark left the scene.  The drivers of the white SUV and the black SUV never returned to the scene.  Jacob was transported to the hospital where he was later pronounced dead.

### 2. <u>Chris Morgeson</u>

At approximately 7:10 p.m., Chris Morgeson was cycling with friends in Westlake Village on Lindero Canyon Road, heading south toward the intersection at Triunfo Canyon Road.  Morgeson lived nearby and cycled along the route at least three times a week.  The speed limit on Lindero Canyon Road, which was clearly marked at the time, was 45 miles per hour.  Three cars "went flying by [Morgeson and his friends]. . . at an incredibly high rate of speed."  There were two dark-colored sedans in the lead and a white SUV behind them.  Morgeson believed that the white SUV was attempting to pass the other two vehicles because it swerved into the bicycle lane and the shoulder several times.  Morgeson testified, ". . . I couldn't believe how fast they were going.  And I just felt this vortex of the wind kind of push me and my buddy as we turned."  "It felt as though someone literally pushed me and my buddy into the sidewalk into the driveway."  "And I couldn't believe it.  I turned to my friend,

8

and I said, 'They're going to kill someone.' And I looked up. They were gone. They were gone, out of sight."

Morgeson described the driving as "Reckless. Excessive in terms of speed." Morgeson estimated that the cars were driving at double the speed limit—i.e., 90 miles per hour. Morgeson and the other cyclists stopped for about 15 minutes and discussed what they had just seen. Then Morgeson started cycling home. Morgeson continued south on Lindero Canyon Road and turned right onto Triunfo Canyon Road (westbound). There were signs indicating a speed limit of 45 miles per hour on Triunfo Canyon Road. Near the intersection of Saddle Mountain Road and Triunfo Canyon Road, police officers instructed Morgeson to cross to the other side of the street. Morgeson heard screaming and saw two areas where emergency personnel appeared to be attending to people. Morgeson did not want to gawk, so he continued cycling westbound on Triunfo Canyon Road. When he was about a block from his home, he saw a police car and the same white SUV that he had seen speeding earlier. He stopped, but he did not see anyone in the car, so he cycled home. At home, Morgeson wrote down everything he had heard and seen so that he would have a clear record of events.

### 3.   **Donald and Shellie Pratt**

Donald Pratt and his wife Shellie Pratt had lived in Westlake Village for 30 years and knew the area well. On the evening of the collision, the Pratts were on their boat on Westlake Lake near the dam that abuts Lindero Canyon Road. Donald estimated that the Pratts' boat was about a football field's length away from the road. Lindero Canyon Road is elevated

9

where the dam begins, so Donald had a clear view of the road from the lake. Donald heard an "extremely loud engine noise and observed two vehicles traveling at [an] extremely high rate of speed traveling southbound on Lindero [Canyon Road]." To Donald, it "sounded like two vehicles racing." Donald saw a dark car in the lead and a lighter colored car trailing it. The vehicles were "flying down the road." Donald heard the cars decelerate at the intersection of Triunfo Canyon Road and then accelerate again. The engine noises stopped.

Shellie also heard and saw two cars at approximately 7:10 p.m. To Shellie, the cars "[s]ounded like they were racing." Shellie had been to a race track not long before that evening, and the cars had sounded the same. When she looked over she saw the headlights and observed that the cars "were traveling at an excessive [rate of] speed and slowed down and then immediately increased the speed again, [at a] very high rate [of speed]." Shellie also observed that the lead car was dark-colored and the car behind it was white. A few minutes later, the Pratts heard sirens.

### 4. Susan Manners

On the night of the collision, Susan Manners was walking westbound on the lake side of Triunfo Canyon Road toward the intersection of Saddle Mountain Drive. She was taking photographs, which she did as a hobby. The area was busy. ". . . [I]t was the pandemic, and a lot of people were out, . . . walking, family stuff . . ." Manners noticed a family on the far side of Triunfo Canyon Road waiting to cross the road. The family began crossing to the lake side (from left to right) and walking

10

toward the median.  Manners then "realized that it sounded like a train was coming.  It was just an enormous noise of cars."  Manners looked up and "saw cars coming way too fast."  The family was continuing to cross the street, but one boy stopped in the middle of the street and fiddled with something like a skateboard or a scooter.  Manners could see the cars coming around the curve, and knew they were going to hit the family.  She jumped into the bicycle lane and waved at the cars to slow down.  The cars did not respond to her warning.  Manners estimated that the cars were driving at a speed of 90 miles per hour—"[i]t was that scary and that fast."  ". . . [T]hey were upon us and there was like no time."

Manners turned as the cars passed.  She was facing the family when the collision occurred.  Manners estimated that she was about 12 feet away from them.  She could not see everything because there was a car in her direct line of sight.  She heard an impact in the right lane (closest to the lake) and then a second impact when a car hit a boy who had been in the left lane walking into the right lane.  The car in the right lane was just barely ahead of the car in the left lane.  Manners estimated that they were one to two seconds apart.  The car in the left lane definitely hit one of the children.  The boy was in front of the vehicle when he was hit, so Manners could not see the impact, but she saw his body fly into the air.  The boy did not go above the roof of the car—he was propelled to the level of the roof or lower.  Manners attributed the collisions with the children to two separate cars, but she only heard the collision on the right and did not see it happen.  Manners called 911.  She then walked up past the intersection and took photos because she was concerned that the scene would not be preserved.  Manners had to walk a

11

significant distance down the street to reach one of the bodies. She took photos of debris from the collision as well.

### 5. Jake Sands

Jake Sands was a passenger in the front seat of Yasamin Eftekhari's car on the evening of the collision. Sands had lived in Westlake Village his whole life and was familiar with it. It was very common to see people out walking and biking in the area where the collision occurred. He described Triunfo Canyon Road as a "quiet" street that people usually used to get to their homes. Eftekhari was driving southbound on Lindero Canyon Road at a speed of approximately 40 to 45 miles per hour. Eftekhari turned right on Triunfo Canyon Road and proceeded westbound on Triunfo Canyon Road in the right lane. It was dusk, but not yet dark. Sands heard the sound of a loud motor and saw headlights in the car's right-side mirror. Without signaling, two cars passed Sands and Eftekhari using the left lane. They were driving within two to three feet of each other. The cars were the same model—Mercedes GLE A.M.G.—"sporty"—SUV's. The lead car was black and the car behind it was white. The cars passed them very fast. Sands looked ahead and saw that there was a family in the crosswalk. The cars were very close together—a distance of only three to five feet. Sands estimated that the two cars were traveling at about twice the speed limit. Sands identified the people crossing Triunfo Canyon Road as a mother, a very young girl, and two boys. They were in the crosswalk, walking from the center median to the sidewalk on the right side of the street. Sands was able to see the crosswalk, which was illuminated by a street light. The mother was closest to the sidewalk on the right

12

with the smallest child, and the two bigger boys were a few feet behind her crossing from the median into the street.  Sands testified, "As I looked forward, seeing the speed and force of the cars and the fashion they were going in, I just instantly thought it's too late.  There is not enough time to stop. . . ."

Sands and Eftekhari had the car windows rolled up, but they heard the engines as the cars approached and the ensuing crash above the sound of the car's radio.  The mother was able to pull the smallest child out of the way, but there was no time for her to reach the older boys.  The family only walked forward a few feet between the time that Sands saw them and the collision.  The black SUV was able to avoid hitting everyone, but the white SUV was not.  Sands saw one of the boys "go to the right side of the road airborne."  After the impact Sands saw "a tap on the brake lights [from both cars] but not really a decrease of speed.  And then I saw both cars just continue on and—poof—it was gone."  Eftekhari pulled over immediately.  She stopped 50 feet before the crosswalk with only gradual braking and pulled over to the right side of the road.  Sands called 911, but he was unable to get through.  Sands got back into the car and drove to a local fire station to alert them of the collision.  The fire crew went to the collision scene.  Sands returned to the scene.  At that point, he realized a second boy had been hit.  There was a skateboard on the left side of the road and a boy's body was lying further away on the left side.

**6.   Yasamin Eftekhari**

Yasamin Eftekhari testified that at approximately 7:10 p.m. on the evening of the collision she was driving on Lindero

13

Canyon Road towards Triunfo Canyon Road. Eftekhari was very familiar with the area—she knew the speed limit was around 40 to 45 miles per hour, and she was familiar with the crosswalk at Saddle Mountain Drive.

Eftekhari was driving at a speed of approximately 45 miles per hour in the right lane. Jake Sands was riding in the passenger seat. It was close to dusk. Right after Eftekhari turned onto Triunfo Canyon Road she saw the headlights of two cars in her mirror. The lights caught Eftekhari's attention because the cars were overtaking her so quickly. Both cars moved into the left lane and passed Eftekhari's car. When they passed her, a white car was in the lead and a black car was following it. The cars moved back into the right lane. Eftekhari was not sure if the cars changed lanes again after that.

At trial, Eftekhari estimated that the cars were driving at a speed of 70 to 75 miles per hour. When police interviewed her right after the collision she estimated that the cars were traveling 100 miles per hour. Eftekhari explained that she was a new driver when she saw the collision and felt that she was better at estimating speed by the time of the trial. Seeing the cars come upon her so fast "spooked" Eftekhari. Eftekhari saw pedestrians ahead of them in the crosswalk—three children and an adult. The adult was closest to the sidewalk. The children and the adult were all walking about a foot apart. It was dusk, but the area was well-lit. The white car was moving straight toward one of the children, who Eftekhari later learned was Jacob. The white car, which was in the right lane, struck Jacob. He came to rest on the right side of the road. At trial, Eftekhari testified that the white car was the first car to pass through the intersection, but at the preliminary hearing she testified that she

14

was unsure which of the two cars was in the lead. Eftekhari heard two distinct impacts about five seconds apart. She did not see the black car strike anyone.

Eftekhari pulled over and tried to help. She did not see Mark get hit and only realized he had been struck later when she saw people gathering farther down the road. Eftekhari recalled seeing Mark's body on the right side of the road.

### 7.    **Pamela Curry**

At the time of the collision, Pamela Curry lived in Westlake Village and walked around the lake often. It was a popular area for people to ride bikes and walk with their dogs during the pandemic. Curry was walking around the lake. As she turned the corner from Lindero Canyon Road onto Triunfo Canyon Road she heard "revving engines, racing cars." Curry saw three cars. The driver of the second car was a woman. "It seemed to be . . . jovial, like there was some sort of a race going on between the first car." Curry listened for them to slow down, but they did not. The cars were driving too fast for the road conditions. Curry estimated that they were driving at least 50 miles per hour as they rounded the corner. They were very close together. The cars appeared to be accelerating.

Curry walked to her car, which was parked at a restaurant on the corner. By the time she reached her car there were paramedics and police arriving at the scene of the collision. Curry was going to go to the scene to offer information, but the area was blocked off, so she went home.

## C.    *Events Following the Collision*

### 1.    Telephone Records

At trial, the parties stipulated that Grossman's Mercedes automatically initiated mbrace, an emergency phone system similar to "OnStar" because the vehicle was involved in a collision.  The parties further stipulated that a recording played for the jury was a true and accurate recording of Grossman's conversation with mbrace.

The mbrace operator verified with Grossman that she was in her 2018 Mercedes Benz white AMG GLE43 Coup, and that she had been involved in an accident at 32258 Triunfo Canyon Road.  Grossman stated that she did not know if someone hit her or she hit them.  She was driving down the road and her airbag "exploded."  The operator kept Grossman on the line while they contacted the Los Angeles County Fire Department.  The fire dispatcher asked if Grossman was near the tennis courts. Grossman responded that she had just passed tennis courts.  The fire dispatcher said that two kids on rollerblades had been hit. The dispatcher asked if that was the accident that Grossman was involved in.  Grossman said she did not know what she hit.  She told the fire dispatcher that she turned the corner at Triunfo Canyon Road and the airbag deployed in her face.  Grossman said she was not injured.  She did not speak again.  Fire dispatch instructed Grossman to remain where she was and then verified vehicle and location details with the mbrace operator.  The mbrace operator terminated the call because Grossman was not responding.

16

Grossman's cell phone records show that she called Erickson at 7:12 p.m.  The call lasted 48 seconds.

## 2.   Deputy Rafael Mejia

Los Angeles County Sheriff's Department Deputy Rafael Mejia testified that at about 7:10 p.m. he responded to a collision at the intersection of Triunfo Canyon Road and Saddle Mountain Drive in Westlake Village.  At the time of the collision, the speed limit on Triunfo Canyon Road was 45 miles per hour, which was reflected in a posted sign.  There was a crosswalk at the intersection at Saddle Mountain Drive, signage for the crosswalk, and "PED XING" was painted in large letters on the roadway approaching the crosswalk.

When Deputy Mejia arrived, the fire department and paramedics were already on site attending to two victims.  A deputy on site directed Deputy Mejia to continue driving west because a white vehicle with front end damage that was responsible had left the scene and had continued driving down the road.

Deputy Mejia encountered a woman later identified as Grossman about three-tenths of a mile down the road.  Grossman was inspecting the front of a white Mercedes SUV, which was stopped on the shoulder of the road with its hazard lights flashing.[4]  Deputy Mejia parked behind the white SUV and

---

[4] It was later determined Grossman's home was also three-tenths of a mile away from the location where the deputy encountered her.

approached Grossman.  The Mercedes had sustained front end damage and the driver's side air bags had deployed.

Grossman told Deputy Mejia that she pulled over because her car had been disabled by Mercedes.  The air bags had deployed and she did not understand why or what was going on. Grossman said she had hit something, but she did not know what.  Deputy Mejia noticed the smell of alcohol on Grossman's breath and person.  He contacted another unit to conduct a driving under the influence (DUI) investigation.

While waiting for the second unit to arrive, Deputy Mejia walked around Grossman's car and observed blood splatter on the front end.  He then went back to his patrol car and tried to calm Grossman until Deputy Michael Kelley arrived to conduct the DUI investigation.

After Deputy Kelley arrived, Deputy Mejia returned to investigate the intersection where the collision took place. Because of the nature of the collision there was a large debris field.  Deputy Mejia recorded the location of the point of impact, the victims' bodies, and debris.  Based on the statements of eyewitnesses, deputies had designated the area of the crosswalk running across the left lane as the point of impact.  Deputy Mejia testified that when other vehicles have driven through a crime scene before it can be contained, the point of impact is always estimated.  Both victims' location of rest was measured from the curb cut in the crosswalk.  Jacob's body came to rest between 50 and 60 feet from the curb cut, and Mark's body was located over 250 feet from the curb cut.  The debris included pieces of a skateboard, a scooter, a child's white sock, and pieces of a car including a piece of a white plastic bumper and a Mercedes emblem.

Deputy Mejia ruled out the possibility that more than one vehicle hit the children. All of the debris was consistent with Grossman's white Mercedes SUV. Deputy Mejia did not discover any debris consistent with a black SUV. In Deputy Mejia's experience, there is always vehicle debris when a car is involved in a collision. Given the great impact that must have occurred to throw the children's bodies so far, Deputy Mejia believed that if there had been a second vehicle involved, it would also have been disabled and would have been discovered. The deputy determined that the cause of the collision was excessive speed.

### 3. **Deputy Michael Kelley**

Los Angeles County Sheriff's Department Deputy Michael Kelley testified that he responded to a call to conduct a DUI investigation on the night of the collision. When he arrived, Deputy Kelley put on a body camera, which he turned on at approximately 8:15 p.m.[5] The first thing the deputy observed was a white SUV with front end damage. Grossman was in the rear passenger seat of Deputy Mejia's patrol car. Deputy Kelley opened Grossman's door and noticed a faint smell of alcohol. Deputy Kelley asked Grossman to exit the patrol car. He took Grossman into an area where there was some light and questioned her using a pre-investigative questionnaire. The questionnaire is designed to rule out any injuries that would require treatment and to get general information about the subject and the vehicle. Deputy Kelley observed that Grossman's pupils were equal, which ruled out the possibility that she

---

[5] The body camera footage was played for the jury. The jury was provided transcripts of the recorded audio.

19

suffered a head injury. Deputy Kelley noticed that Grossman's eyes were watery and glassy and her eyelids were a little bit droopy, which are signs of intoxication.

Grossman admitted that she was the driver of the white Mercedes SUV. Grossman denied any illness or injury. She stated that she was not diabetic or epileptic, was not under the care of a doctor or dentist, and was not taking medication on a regular basis. Grossman stated that she had one margarita at Julio's Agave Grill before driving. She said that she consumed the margarita between approximately 5:00 p.m. and 5:30 p.m.

Deputy Kelley conducted a Field Sobriety Test (FST or FST test) to determine whether Grossman exhibited physical clues associated with intoxication. The National Highway Traffic Safety Administration sets guidelines for how many clues must be present to indicate that a person is impaired. Deputy Kelley testified that mental impairment from alcohol precedes physical impairment. Grossman exhibited clues indicating impairment on several of the tests, but on other tests she "did okay." Grossman was cooperative, her speech was normal, she had "fair" coordination, and her clothes were orderly. Deputy Kelley testified that he did not administer some of the FST tests properly. Even taking this into account, Deputy Kelley did not believe that Grossman demonstrated that she had "normal good mental and physical faculties." Grossman displayed several signs of impairment during the FST's.

After concluding the FST, Deputy Kelley asked Grossman if she would consent to a Preliminary Alcohol Screening (PAS) test to assist him in determining whether she was under the influence of alcohol. Deputy Kelley advised Grossman that she could refuse to take the PAS test, but if she was arrested she would be

20

required to give a sample of her blood or breath for purposes of determining her blood alcohol content. Grossman consented to take the PAS test. Deputy Kelley testified that the PAS test is performed using a hand-held breathalyzer with either an automatic or manual trap. An automatic trap requires a certain amount of air to trigger a reading. If the subject does not provide adequate air to get a reading on an automatic trap, the officer can manually capture air by pressing a button. Grossman did not provide an adequate breath sample for the automatic trap. She told Deputy Kelley that she had asthma. Deputy Kelley made six attempts before switching to a manual trap. Deputy Kelley administered a second PAS test a few minutes later. Grossman again failed to trigger the automatic trap, so he used a manual trap. The deputy testified: "She wasn't blowing, or gave . . . little breath[.]" The manner in which Grossman performed the PAS tests made Deputy Kelley question whether Grossman was "trying to trick the system and . . . trying to get a lower reading." Based on the FST and the results of the PAS tests, Deputy Kelley formed the opinion that Grossman was under the influence of alcohol.

At approximately 8:42 p.m., Deputy Kelley directed his partner to handcuff Grossman. The deputy handcuffed Grossman, escorted her to a police vehicle, and placed her under arrest. The deputy informed Grossman that she was being arrested for driving under the influence and causing a fatal traffic collision.

21

### 4. Results of PAS Tests

The parties stipulated that Deputy Kelley performed the PAS tests at 8:32 p.m. and 8:35 p.m., and that the results reflected that Grossman had a blood alcohol content of .076 and .075 percent, respectively.

### 5. Teryl Grasso

Grossman was transported to Los Robles Emergency Room, where her blood was drawn at 10:17 p.m. pursuant to a warrant. Emergency medical technician Teryl Grasso collected Grossman's vital information. Grasso testified that Grossman spontaneously said to her, " 'If they didn't disable my car, I would be at home in my garage right now.' " Grasso delayed reporting Grossman's statement for three years. Grasso explained that she was traumatized by her interaction with Grossman and had gone to therapy, but that she still had difficulty talking about the night of the accident. Once out of therapy, Grasso did not report the statement because she was concerned that it would be a violation of Grossman's medical privacy rights. Grasso spoke to her supervisor who encouraged her to come forward to police with the information, so she did.

### 6. Dr. David Matero

Dr. David Matero performed a medical clearance evaluation of Grossman to determine whether she suffered any injuries, including whether she suffered injuries from the deployment of her car's airbags. Dr. Matero testified that people

who have been injured by airbags usually have burns on exposed areas of skin. Grossman denied any pain or injury and Dr. Matero did not observe any evidence of pain, injuries, or bruising. Grossman had no difficulties walking, such as limping or signs of discomfort. Dr. Matero testified that it was difficult to elicit information from Grossman and that she continually told him he would need to talk to her husband about her medical problems. She denied taking any medication. Grossman's demeanor was "dismissive" and "maybe even slightly hostile."

## D. *Toxicological Evidence*

### 1. Sylors Chem

Sylors Chem, a criminalist with the Los Angeles County Sheriff's Department's Forensic Alcohol Section, testified regarding the effects of alcohol on mental and physical abilities. Mental abilities that may be impaired include the ability to process information, make decisions, and multi-task, as well as a decrease in perception and reaction time. Peripheral vision may be decreased resulting in tunnel vision. Physical abilities that may be impaired include coordination, balance, and speech. A person's eyes may become red and watery. Mental impairment occurs before physical impairment. The ability to operate a vehicle is most impacted by mental impairment. The inability to process information at a normal rate "is the difference between driving safely and not driving safely." A person is impaired for the purposes of safe driving well before they appear "drunk" as that term is commonly understood—i.e., stumbling, slurred speech, etc. In Chem's opinion "at 0.08 percent alcohol level

everyone is mentally impaired to operate a motor vehicle safely." "[A]t 0.07 percent most individuals will be impaired mentally to operate a motor vehicle safely." "[A]t a 0.04 percent some individuals may be impaired to operate a motor vehicle safely." "[M]otor vehicle collisions start[] at . . . 0.04 [percent blood alcohol content]. . . . [I]ncreased to a 0.06 percent, the chance of you likely [sic] to have a motor vehicle collision related to alcohol is twice. At a 0.08 it's five times. At 0.15 percent it increases to 22 times likelihood." Performing an FST is much less complicated than driving a car. An impaired driver may still perform relatively well on an FST. A person with a tolerance to alcohol can mask their physical impairment. "[Y]ou can't mask the mental impairments due to alcohol. You can't mask judgment. You can't mask the ability to process information. You can't mask reaction time."

Chem conducted two forensic alcohol analysis tests on Grossman's blood and obtained a 0.08 percent average blood alcohol content on the first test and a 0.081 percent average blood alcohol content on the second, with an uncertainty level of 0.004 percent.

Chem testified that a hypothetical 130-pound female who has a blood alcohol content of 0.08 percent would have at least two standard drinks in their bloodstream. If a 130-pound female consumed one ounce of 80 proof alcohol between 4:30 p.m. and 5:30 p.m., the most alcohol they would have in their system would be 0.028 percent because the alcohol was consumed over an hour. Assuming they were drinking socially—approximately one drink per half hour—the person would reach their peak alcohol level at 6:00 p.m. By 7:00 p.m., they would have at most a 0.01 percent alcohol level. By 10:15 p.m. that person would

24

have an alcohol level of zero percent. If the same person consumed one-ounce of 88 proof alcohol between 4:30 p.m. and 5:30 p.m., and two ounces of 88 proof alcohol plus one ounce of 30 proof alcohol between 6:30 p.m. and 7:00 p.m., they would have a 0.04 percent blood alcohol content at 10:15 p.m.

Chem testified that some of the alcohol in the blood will evaporate if a blood sample is opened, and over time additional alcohol will dissipate. If blood is refrigerated for between one and three months, four to 14 percent of the alcohol may dissipate. If blood tested at 0.08 percent and was opened and stored for a little over a month, a subsequent test yielding a result of 0.074 percent or 0.075 percent would be within the expected rate of dissipation.

### 2. Blake Byfuglin

Blake Byfuglin, a senior criminalist with the Los Angeles County Sheriff's Department's Toxicology Section, testified that on October 5, 2020, Grossman's blood sample was located in the Downey Laboratory and assigned to Sylors Chem. Chem returned the sample on October 6, 2020. On October 7, 2020, Byfuglin performed a preliminary screening of Grossman's blood sample to test for the presence of drugs. The results were positive for benzodiazepines, so Byfuglin sent the sample for confirmation testing.

### 3. Christopher Lopez

Christopher Lopez, a criminalist with the Los Angeles County Sheriff's Department's Toxicology Section, testified that he performed a qualitative analysis of Grossman's blood sample

to confirm the presence or absence of benzodiazepines. The results do not provide a quantity for present benzodiazepines—they are either detected or not detected. Grossman's blood tested positive for diazepam (valium) and nordiazepam, which is both a metabolite of valium and an independent drug.

### 4. **Vanessa Meneses**

Vanessa Meneses, a forensic scientist at the Orange County Crime Laboratory, testified that the Orange County Crime Laboratory performed a blood alcohol analysis and drug toxicology analysis after the Los Angeles County laboratory performed its analyses. Meneses was cross-trained to perform both alcohol and drug analyses. Meneses confirmed that the results from the Los Angeles County laboratory were appropriate. Meneses determined that Grossman's blood alcohol content was 0.074 percent weight by volume and 0.073 percent weight by volume, with an uncertainty level of plus or minus 0.005.

Meneses testified that alcohol consumption impairs mental abilities such as thinking, judgment, and decision-making before impairing physical abilities including balance and coordination. Meneses opined that at 0.08 percent blood alcohol content all individuals are impaired for the purposes of driving, and most people are impaired for the purposes of driving at 0.05 percent blood alcohol content. Meneses participated in ride-alongs with various agencies to observe FST's. In her opinion the FST's were less complicated to perform than driving a vehicle. Meneses opined that a person could perform fairly well on an FST and still be mentally impaired by alcohol.

Meneses opined that a hypothetical 130-pound female with a blood alcohol content of 0.074 percent blood alcohol content at the time of testing would have 2.4 to 2.5 standard drinks in their system. If the same individual consumed one standard drink of 80 proof alcohol between 4:30 p.m. and 5:30 p.m., they would have a blood alcohol content of zero at 10:15 p.m. In that same scenario, the maximum blood alcohol content that Meneses would expect to see at 7:00 p.m. would be 0.0015 percent. If the same person consumed one ounce of 88 proof alcohol between 4:30 p.m. and 5:30 p.m., and two ounces of 88 proof alcohol plus one ounce of 30 proof alcohol between 6:30 p.m. and 7:00 p.m., they would have a 0.015 percent blood alcohol content at 10:15 p.m. If the same person consumed one ounce of 80 proof tequila and one ounce of a 30 proof liqueur between 6:30 p.m. and 7:30 p.m., Meneses would expect their blood alcohol content to be zero at 10:15 p.m. If the same person consumed one ounce of 88 proof alcohol between 4:30 p.m. and 5:30 p.m., and two ounces of 88 proof alcohol plus one ounce of 30 proof alcohol between 6:30 p.m. and 7:00 p.m., they would have a 0.04 percent blood alcohol content at 10:15 p.m.

Meneses testified that if a blood vial is opened a number of times, alcohol may evaporate, which would decrease the testing value. That the results from the Orange County lab were slightly lower than the results from the Los Angeles County lab was consistent with the vial being opened multiple times for testing and not refrigerated during transportation.

The Orange County laboratory's drug toxicology analysis detected the presence of caffeine, fluoxetine (prozac), norfluoxetine (a breakdown product of fluoxetine), and nordiazepam. It was not surprising to Meneses that the Los

27

Angeles County laboratory detected diazepam, when Meneses only detected nordiazepam, its metabolite. Diazepam is not stable in the blood.

Nordiazepam is a depressant that can impact an individual's ability to drive by hampering the person's ability to think critically and make decisions. It can also cause drowsiness and affect balance, coordination, and reaction time. Normally when someone is prescribed a drug like valium, of which nordiazepam is a metabolite, they are given warnings not to drive a vehicle. When two or more drugs are taken together they can have an additive effect. The combination of nordiazepam and alcohol will have a greater effect than either would separately because they are both central nervous system depressants.

Based on a hypothetical driver consistent with the evidence in the case, including how the crimes occurred, the driver's performance on the field sobriety tests, the PAS results, and the Orange County laboratory test results, Meneses opined that the driver was consistent with someone impaired for the purposes of driving.

5.      **Detective Michael Takacs**

Detective Michael Takacs, a drug recognition expert with the Los Angeles County District Attorney's Office testified that a person may be impaired to drive with a blood alcohol level of less than 0.08 percent. A person who is impaired may be physically able to drive, but mentally unable to do so safely. Diazepam and nordiazepam are psychoactive drugs that depress the central nervous system. Alcohol is also a central nervous system

28

depressant.  When depressants are mixed together, it creates an additive effect which increases impairment.

Detective Takacs testified that incorrect administration of an FST does not necessarily invalidate the entire test.  Only the clues that resulted from the errors could not be taken into consideration.

When Detective Takacs watched the video of Grossman's FST's, he noticed that Grossman's statements were evasive—she said she took "some things" when asked about medication, that she did not know what she hit, and that her car "stopped." Detective Takacs observed several clues of impairment. Detective Takacs had successfully administered the PAS test using an automatic trap to people who claimed to suffer from asthma.  Use of a manual trap will generally return lower blood alcohol level results than use of an automatic trap.  It appeared that Grossman did not intend to blow into the PAS machine but was instead "kind of playing with it."  Grossman "didn't give two legitimate readings [on the PAS test].  She was manually trapped.  It wasn't a full breath."

Based on a hypothetical tracking the facts of this case, including the FST and PAS results, Detective Takacs opined that such a person was impaired.

## E.   *Coroner's Report*

Los Angeles County Department of Medical Examiner coroner Dr. Matthew Miller performed Mark and Jacob's autopsies.

Dr. Miller concluded that Mark's death was caused by an automobile versus pedestrian collision.  Mark died as a result of

blunt force traumatic injuries, including a fracture to the back of his skull which caused significant bleeding around the brain, blood in his chest, a broken arm, a broken femur, pelvic fractures, and a fracture of the thoracic spine which resulted in a complete separation of the spine and spinal cord just below the base of the neck. The skull fracture alone would have been lethal.

Mark had a "hybrid sharp force injury/abrasion" pattern on his rear thighs and lower buttocks. Dr. Miller examined the grille of Grossman's vehicle and concluded that the pattern of these force injury/abrasions was "almost an exact match to the pattern of that grille." The hard plastic material of the grille would produce this type of injury. Mark's injuries were inconsistent with tire marks or treads. Dr. Miller testified that, given Mark's injuries, he was likely knocked unconscious immediately and killed within seconds or minutes. None of Mark's injuries suggested that he was run over. Mark had "exactly the type of patterned injury when a pedestrian is struck by an automobile at a high rate of speed, generally because they end up being propelled." In Dr. Miller's opinion, Mark's injuries were consistent with a single-vehicle collision, but it was not possible to discern from the autopsy whether Mark was hit by one vehicle or two.

Dr. Miller concluded that Jacob also died as a result of blunt force traumatic injuries caused by a vehicle versus pedestrian collision. Jacob died shortly after he was transported to the hospital, however. Jacob suffered complete dislocation between the C-1 vertebra and the skull which resulted in instant paralysis from the head down and hemorrhaging around the spinal cord and base of the skull, blood in the chest, two broken femurs, pelvic fractures, and multiple abrasions. Spinal cord

separation of the type Jacob suffered is usually quickly fatal, but some people will survive with paralysis from the head down. Jacob was likely unconscious almost immediately. In Dr. Miller's opinion, Jacob's injuries were consistent with a high-speed single-vehicle collision. As with Mark, there was no way to determine whether Jacob was struck by more than one vehicle from the autopsy.

Dr. Miller testified that blood spatter may or may not occur in a vehicle/pedestrian collision depending on the type of injury suffered. If two people are hit by a car, there may be two audible impacts. Two impacts might be heard if the people being struck are staggered or if they are hit at the same time but then one is thrown onto a surface that makes an audible impact. Depending on the velocity and distance a person is thrown and what they strike, there may be multiple audible impacts. If someone is struck while riding a skateboard, the skateboard could create an audible impact. In a collision like the one Jacob and Mark suffered, Dr. Miller would not expect the bodies to fly up very high, but rather to be propelled forward.

## F.    *Inspection of Grossman's Vehicle and Collision Reconstruction*

### 1.    <u>Christopher Lee</u>

Los Angeles County Sheriff's Department senior criminalist Christopher Lee was part of a team that inspected Grossman's vehicle on October 6, 2020. Lee was tasked with documentation and collection of evidence. Lee documented extensive damage to the Mercedes' front grille area, hood, radiator, license plate

frame, front passenger side bumper, the headlight housing on the front passenger side, the front passenger side quarter panel, and the driver's side mirror. Lee documented stains on the front end and front passenger side of the hood that tested negative for blood. He also documented stains on the grille, the hood, the driver's side of the front bumper, and the rear driver's side exterior door that tested positive for blood. Lee noted that the airbags had deployed at the steering wheel and driver's side knee area.

### 2.     **Officer Garrett Smith**

Garrett Smith was a highway patrol and verification officer with the California Highway Patrol in September 2020. Smith performed an inspection of Grossman's Mercedes and determined that there were no pre-existing mechanical defects that could have caused the collision.

### 3.     **Michael Hale**

Michael Hale, an investigator with the Orange County District Attorney's Office Vehicular Homicide Unit, investigated the collision. Hale reviewed the Event Data Recorder (EDR) download from Grossman's vehicle. The EDR is housed in the vehicle's air bag control module. The EDR monitors speed, throttle, and braking. When an air bag deploys, the airbag control module records data for the five seconds before the airbag deploys, counting down from negative five to zero, and creates a report. Federal law requires that EDRs record and provide the

32

speed the vehicle was traveling prior to a collision with a margin of error of plus or minus 0.62 miles per hour.

The report from Grossman's vehicle included multiple data samples. At five seconds prior to impact, the Mercedes was traveling at 73 miles per hour. By two seconds prior to impact it had accelerated to 81 miles per hour. At the time of the collision, the vehicle had decreased its speed to 73 miles per hour. The vehicle's throttle was at 78 percent five seconds prior to impact and then moved to 98 percent through three seconds before impact. Hale opined that this was likely the highest the throttle would go, meaning that Grossman had fully depressed the accelerator. At two and a half seconds prior to impact the throttle decreased to 83 percent. At two seconds prior to impact the throttle went to zero percent—i.e. Grossman took her foot off the accelerator. The throttle remained at zero percent through the collision.

From the foregoing data, Hale could determine the distance between the Mercedes and the point of impact over the five seconds before the collision. The EDR reflects what actually happened, and it also makes it possible to determine what would have happened if the Mercedes had been traveling at the speed limit. If calculations show there would have been a crash if the car was traveling the speed limit, speed cannot have been the primary collision factor. Conversely, if a collision would not have occurred at the speed limit, speed is the primary collision factor.

Hale determined that at the posted speed limit of 45 miles per hour, there would not have been a collision. At five seconds before impact, Grossman's vehicle was 559 feet away from the children. Had she been driving at the speed limit, Grossman's car would have been 233 feet away from the point of impact when

the children were there, and by the time the car reached the area of impact, the children would have been a minimum of 21 and a half feet away, outside the lanes of vehicle travel and nearly on the sidewalk. Hale used the children's expected walking speed to make the calculations, which is the speed estimate most favorable to the driver. The EDR showed that Grossman braked for one second. Hale described the force that Grossman applied as "light braking" that resulted in only a six mile-per-hour decrease in speed, from 81 miles per hour to 75 miles per hour. Hale calculated that the force of the Mercedes hitting the children while traveling 73 miles per hour as equivalent to the force that would be applied if the Mercedes was dropped on the children from the top of a 12-story building. The crash pulse data on the EDR was consistent with the Mercedes striking both children.

The Mercedes has several automatic safety features that are activated in a crash. The fuel pump shuts off as well as the engine. After the engine shuts off there is a vacuum reservoir system to provide two or three more power brake applications. After that, braking is still possible, just not power braking. Following an accident/air bag deployment, the hazard lights and emergency lighting are also activated. If the vehicle is equipped with an mbrace system, as Grossman's was, mbrace makes an automatic emergency call to Mercedes-Benz to alert it of a collision.

### 4. **Deputy Robert Apodaca**

Los Angeles County Sheriff's Department Deputy Robert Apodaca conducted a speed analysis of the collision in February

34

of 2021. Deputy Apodaca testified that he visited the collision site and reviewed the paint markings where the victims and debris had been located. Jacob's body had come to rest approximately 70 feet from the crosswalk. Based on a photo of Grossman's car, Deputy Apodaca opined that Jacob was struck by the passenger headlight area of the Mercedes and projected sideways. The deputy could not use the resting position of Jacob's body to determine the speed that Grossman was traveling because her car did not hit Jacob straight on; Jacob was pushed to the side in a "fender vault." Jacob's body went over the side of the car and did not absorb the full forward momentum of the vehicle.

Deputy Apodaca testified that Mark's body came to rest approximately 254 feet (84 yards) from the crosswalk. Given Mark's resting position, Deputy Apodaca opined that Mark was struck in the center of the left lane closest to the median, and that his body absorbed the full impact of the car. This was corroborated by the damage to the grille of Grossman's car, which was caused by a direct impact. The grille was pushed back toward the engine and there was also direct damage to the hood above the grille. The hood appeared to be folded and pushed backwards.

Deputy Apodaca also examined photos of injuries to Mark's body. The deputy testified that Mark had "very thick distinct bruising along his lower back which matches up with the thickness of the hood where the direct damage is being pressed into, the direct damage of the car, as well as he's got grill[e] marks along his upper thighs. The distance between the bruising on the lower back and the bruising from the grill[e] on the thighs matches what I'm seeing with the direct damage in the car."

35

Based on the damage to Grossman's car and the injuries to Mark's body, Deputy Apodaca opined that Mark was hit by the center of the car, closer to the driver's side and right above the license plate. As a result, Mark's resting place provided better data for estimating Grossman's speed. Deputy Apodaca used two formulas to calculate the Mercedes' speed based on Mark's position and other known factors. The more reliable calculation showed Grossman's car as moving at a speed between 71.3 and 70.89 miles per hour, which was consistent with the data from the EDR download and witness statements. Using the less accurate formula, Deputy Apodaca calculated the vehicle's speed as between 66 and 68 miles per hour at the point of impact.

### 5. John Grindey

Mechanica Scientific Services Corporation chief operating officer and collision reconstructionist John Grindey testified regarding reconstruction of the collision and EDR analysis. The EDR download reflected that Grossman depressed the accelerator 98 percent. Grindey considered this to be "pretty much full throttle" or "flooring it." He had rarely seen a car reach 100 percent depression of the accelerator. Two seconds prior to the airbags deploying, Grossman was driving at a speed of 81 miles per hour. At the time of the collision she was traveling at 73 miles per hour. Her brakes were off at the time of impact. The EDR showed a delta V of 1.2, which was consistent with hitting a pedestrian. The EDR showed two "crash pulse" peaks consistent with hitting two children with "a little bit of offset."

Grindey reviewed Hale's time-distance analysis and agreed with it. Grindey concurred with Hale that if Grossman had been

36

traveling at the speed limit of 45 miles per hour the collision would not have occurred because the children would have had time to reach the sidewalk. Grossman would still have had the ability to brake after her emergency system activated, just without power assistance. If Grossman had applied her brakes after the collision, she would have stopped sooner than she did.

Grindey viewed Grossman's Mercedes in person. He observed two areas of impact—one at the front center and a second at the front passenger side headlight. The damage on the front of the Mercedes was consistent with the injuries to Mark. Grindey testified that "[W]hen you look at close up on the grill[e] and the lower grill[e], there is a very specific scallop looking [pattern]. . . . [The same] scallops . . . were located on Mark's buttocks and upper thigh on both his right and left leg." Nothing on Mark's body or in the coroner's report indicated that Mark was run over or that he was hit by more than one vehicle. Mark's injuries were consistent with a direct high speed impact with a single vehicle.

Grindey opined that the damage on the front passenger-side headlight area was consistent with the impact to Jacob. Jacob was "fender vaulted" and pushed to the right because he was hit where the car curved. Mark and Jacob's positions were consistent with the types of impact each suffered. Grindey would expect witnesses to hear multiple impacts.

Grindey concluded that Jacob did not absorb the full impact of Grossman's car, so Jacob's resting place could not be used to estimate Grossman's speed. In contrast, Mark absorbed most or all of the car's speed. Based on Mark coming to rest 246 feet from the point of impact, Grindey calculated that Grossman was traveling at a speed between 68 and 71 miles per hour when she

struck Mark and Jacob. Grindey's calculations were consistent with the EDR download, witness statements, and the speed analysis.

Grindey independently concluded that Mark and Jacob were struck in the crosswalk. Jacob was almost at the line marker between the left and right lanes and Mark was about two feet behind Jacob in the left lane.

In Grindey's opinion, Grossman's car was the only car involved in the collision. Mark and Jacob's injuries were consistent with one impact, not two, and all the debris at the crime scene was from a single vehicle.

### 6. Jeffrey Muttart

Jeffrey Muttart, an expert on driver behavior and response to hazards, reviewed the case to determine whether Grossman's response when faced with the collision was within the normal range of drivers in a substantially similar situation. Muttart evaluated the period from when the Iskanders first left the median to the time when Grossman pressed her brakes. At 204 feet from the crosswalk, 85 percent of drivers traveling 45 miles per hour would have been able to see the Iskanders, respond, and completely stop. In this situation, it was not even necessary to stop completely to allow the Iskanders to clear the intersection. Muttart created photos to show the conditions at the scene. He testified that looking at the photos "there is no reason to crash if you're traveling at 45 [miles per hour]. . . . [Y]ou see it wasn't really close. . . . [T]hese pedestrians were there to be seen." Grossman's response time was in the normal range. Muttart concluded that the cause of the crash was her speed. Although

Grossman's response time when she pressed the brakes was in the normal range, at 81 miles per hour, "100 percent of drivers crash; at 45, near zero crash. And it boils down to speed." If Grossman had only been driving at a speed of 57 miles per hour and had the same reaction, she would not have hit anyone because the children would have been out of her path.

## G.    *Evidence of Grossman's Awareness of the Dangers of Speeding*

On August 3, 2020, Grossman texted Rene Villanueva regarding an automobile accident in which two young men who were speeding on Westlake Boulevard lost control of a vehicle, hit a tree, and burned to death. She expressed concern for parents of teenage drivers who must always have a fear that such tragedies could occur.

On March 10, 2013, California Highway Patrol Officer Robert Leffler issued a citation to Grossman for driving 92 miles per hour on the 101 Freeway, where the posted speed limit was 65 miles per hour. Officer Leffler's standard practice was to warn that "speed in excess only contributes to a greater chance of collision, and those collisions often result in injury and/or death depending on how severe it is." Officer Leffler told Grossman to "mind her speed." Officer Leffler testified that Grossman "made a voluntary statement that she hopes I don't need the use of the [Grossman] burn center in the future." Grossman's comment was not a common reaction to a speeding citation.

## H.   *Video Evidence*

Authorities obtained three surveillance videos that depicted Grossman's vehicle and other cars traveling westbound on Triunfo Canyon Road following the collision.  The videos did not depict the collision or the collision site.  They depicted a portion of the road further northwest.

## DISCUSSION

## A.   *Implied Malice Murder Instructions*

Grossman contends that the trial court made two errors when the court instructed the jury on implied malice.  First, she alleges the court erred by failing to instruct, under CALCRIM No. 520, that an act is only "dangerous to human life" if there is a high degree of probability that the act will result in death.  Second, Grossman complains that the court should have instructed the jury that it must unanimously agree regarding which acts she committed that endangered human life.  Both contentions lack merit.

## 1.   The Trial Court Fully Instructed the Jury Under CALCRIM No. 520

### a.   *Legal Principles*

"Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was

deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' (*People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).)" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

"Implied malice has ' "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' " ' [Citation.] Thus, to be culpable as a direct aider and abettor of implied malice murder, the accomplice ' "must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act." ' [Citations.]" (*People v. Werntz* (2023) 90 Cal.App.5th 1093, 1115.)

"The mental component of implied malice murder requires that the defendant ' " 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' " ' [Citation.] ' "[T]he aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather . . . he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." ' [Citations.] "The requisite intent is a subjective one—the defendant must have " '*actually appreciated* the risk involved.' " ' [Citation.] ' "In short, implied malice [murder] requires a defendant's awareness of engaging in conduct that endangers the life of another." ' [Citations.]" (*People v. Werntz, supra*, 90 Cal.App.5th at p. 1116.)

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on

41

whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

### b. *Proceedings*

At trial, the court instructed the jury under CALCRIM No. 520 (March 2021 rev.) regarding second degree murder as follows:

"The defendant had *implied malice* if:

"1.     She intentionally committed the act;

"2.     The natural and probable consequences of the act were *dangerous to human life*;

"3.     At the time that she acted, she knew her act was *dangerous to human life*;

AND

"4.     She deliberately acted with conscious disregard for human life."  (Italics added.)

### c. *Analysis*

Grossman contends that her second degree murder convictions in counts 1 and 2 must be reversed because the trial court failed to fully instruct the jury regarding implied malice. Specifically, Grossman argues that CALCRIM No. 520 (March 2021 rev.) did not state that the phrase "dangerous to human life" means " 'a high degree of probability that [the act] will result in death.' "  Grossman claims that in *Reyes*, *supra*, 14 Cal.5th 981, the Supreme Court "confirmed" that " 'a high degree of probability that [the act] will result in death' is the controlling standard for implied malice murder."  Grossman asserts that the

42

formulations of the standard differ because an act may be dangerous to human life but not have a high probability of resulting in death. We reject the contention.[6]

The Supreme Court has long recognized that there are two equivalent formulations of the standard for implied malice. (*Knoller*, *supra*, 41 Cal.4th at p. 152 ["the[] two definitions of implied malice in essence articulate[] the same standard"]; see also *People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson*) [the two standards articulate the same concept "[p]hrased in a different way"]; *People v. Pierce* (2025) 114 Cal.App.5th 508, 525 ["the requirement that an act carry a 'high probability' of death is not new, and *Reyes* itself noted the equivalence of the *Thomas* and *Phillips* formulations"].) The *Thomas* test or formulation (originating in Justice Traynor's concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470, 480) states that "malice is implied when 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' " (*Knoller*,

---

[6] The People argue that Grossman forfeited her challenge by failing to object to the instruction in the trial court. Whether the claim was forfeited turns upon whether the instruction was legally correct. (See *People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1087 [challenge preserved despite lack of objection where instruction is not legally correct]; *People v. Richardson* (2008) 43 Cal.4th 959, 1022–1023 [failure to request modification of otherwise correct instruction forfeits claim on appeal]). Because Grossman contends that the jury instruction did not clarify the meaning of "dangerous to human life," we could deem her argument forfeited. But even assuming that Grossman's contention can properly be characterized as one that challenges the legality of the instruction as delivered, we explain why we disagree.

*supra*, at p. 152.)  The *Phillips* test or formulation (originating in *People v. Phillips* (1966) 64 Cal.2d 574, 587 (*Phillips*)) states that "[m]alice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' "  (*Knoller*, *supra*, at p. 152.)

The version of CALCRIM No. 520 (March 2021 rev.) under which the trial court instructed the jury solely included the *Phillips* formulation of the standard.  The Supreme Court has upheld the use of the *Phillips* test's "dangerous to human life" formulation in jury instructions.  In *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 110–111 (*Nieto Benitez*), the defendant challenged a revised version of CALJIC No. 8.31 for omitting the requirement that the relevant act must involve a high probability of resulting in death, which had been included in an earlier version of the instruction.  The defendant argued, as Grossman does here, that the high-probability-of-resulting-in-death language articulated "an elevated standard" compared to the requirement in then-current CALJIC No. 8.31 of "an act whose 'natural consequences' are dangerous to life."  (*Id*. at p. 111.)  Citing to the cases in which it had confirmed that the two phrases articulated the same standard, as well as other precedent discussing the elements of implied malice, the Supreme Court held that CALJIC No. 8.31 "correctly distills the applicable case law."  (*Ibid*.)

*Reyes* did not impact the validity of this jurisprudence.  (*People v. Pierce, supra,* 114 Cal.App.5th at pp. 526–529.)  In *Reyes*, *supra*, 14 Cal.5th 981, the defendant petitioned for vacatur of his murder conviction and resentencing pursuant to section 1172.6.  In denying Reyes's petition, the trial court "found that

44

'the act in this case is the defendant, along with several other gang members, one of which [was] armed, traveled to rival gang territory,' that the natural and probable consequence of their doing so was dangerous to human life, that Reyes was aware the act was dangerous to human life, and that he deliberately acted with conscious disregard for that danger.' " (*Id*. at p. 987.) On appeal, Reyes argued that he could not now be convicted under a valid theory of murder because the prosecution could not show that he committed " 'an act that actually . . . help[ed], encourage[d], [or] facilitate[d] [the shooter] in the shooting.' " (*Ibid*.) The Court of Appeal affirmed the superior court's order. (*Ibid*.)

The Supreme Court granted review and reversed. (*Reyes*, *supra*, 14 Cal.5th at p. 992.) With respect to direct perpetrator implied malice murder, the Supreme Court concluded that the victim's death was not a natural and probable consequence of Reyes's act of bicycling into rival gang territory and chasing a car with an armed compatriot. (*Id*. at p. 989.) The court stated that "[t]o suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' [Citations.]" (*Ibid*.) In so stating, the court quoted *Knoller*, *supra*, 41 Cal.4th 139, and included a parenthetical stating that the *Thomas* and *Phillips* tests articulate the same standard. (*Ibid*.) The court held that there was insufficient evidence to support the finding that Reyes was a direct perpetrator who acted with implied malice. (*Ibid*.)

*Reyes* did not hold that CALCRIM No. 520 incorrectly stated the law with respect to direct perpetrator implied malice murder or hold that a "high degree of probability that death will

45

result" was the controlling standard. *Reyes* provides no basis for departing from *Nieto Benitez.*

Grossman's argument that Justice Evans's statement concurring in the Supreme Court's denial of review in *People v. Doaifi* (June 25, 2024, G062098) (nonpub. opn.), review denied October 16, 2024, S286155 (conc. stmt. of Evans, J.) (*Doaifi*), and Justice Liu's concurring opinion in *People v. Cravens* (2012) 53 Cal.4th 500, support her position is unpersuasive in the face of this clear, binding Supreme Court precedent. (See *People v. Pierce*, *supra*, 114 Cal.App.5th at pp. 527–529 [rejecting Grossman's *Doaifi* argument].)

Grossman's contention that CALCRIM No. 520 incorrectly stated the law is without merit.[7]

---

[7] On November 20, 2025, Grossman filed a letter purporting to advise this court of new authority. In the letter, Grossman informs the court of revisions to CALCRIM No. 520. Rules of Court, 8.254(a) provides: "If a party learns of significant new authority, including new legislation, that was not available in time to be included in the last brief that the party filed or could have filed, the party may inform the Court of Appeal of this authority by letter." Counsel is advised that " 'jury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles.' " (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1157, fn. 7; see also *People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.) The revisions to CALCRIM No. 520 are not the proper subject matter for a letter advising this court of new authority.

## 2.    The Trial Court Was Not Required to Give a Unanimity Instruction

### a.    *Legal Principles*

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).)

"This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.] For example, in *People v. Diedrich*[ (1982)] 31 Cal.3d 263, the defendant was convicted of a single count of bribery, but the evidence showed two discrete bribes. [The Supreme Court] found the absence of a unanimity instruction reversible error because without it, some of the jurors may have believed the defendant guilty of one of the acts of bribery while other jurors believed him guilty of the other, resulting in no unanimous verdict that he was guilty of any specific bribe. (*Id.* at pp. 280–283.) 'The [unanimity] instruction is designed in part to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something*

47

sufficient to convict on one count.' [Citation.]" (*Russo, supra,* 25 Cal.4th at p. 1132.)

In contrast to the situation where evidence of two discrete crimes is presented, "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty. [Citation.]" (*Russo, supra,* 25 Cal.4th at p. 1132.)

### b.    *Analysis*

Grossman contends that the trial court should have instructed the jurors that they must unanimously agree on the act that established liability for implied malice murder. Grossman complains that the prosecution relied on "a hodgepodge of conduct from which the jurors could pick and choose in order to convict [her,]" including speeding, engaging in a speed contest, committing a crosswalk violation, and driving while impaired by alcohol and/or drugs.

Grossman's argument ignores the distinction between an act that constitutes a *crime* and conduct (whether or not the conduct is criminal) that constitutes evidence supporting the prosecution's *theory* of the manner in which a crime was committed. As *Reyes* stated, in the context of implied malice, " '[t]he relevant act is the act that proximately causes death.' " (*Reyes, supra,* 14 Cal.5th at p. 992, quoting *People v. Powell* (2021) 63 Cal.App.5th 689, 713, fn. 27.) The relevant act in each of counts 1 and 2 was Grossman's driving, which resulted in the death of a child. The jury did not have to agree which aspects of

48

Grossman's driving made it dangerous to human life; they needed only to unanimously agree that Grossman's driving *did* endanger human life. The trial court did not err by not instructing the jury that it had to unanimously agree that Grossman's driving included specific conduct.

## B.  *Sufficiency of the Evidence*

Grossman next contends that her convictions for murder (counts 1 and 2) must be reversed because there was insufficient evidence that she acted with implied malice—specifically, that there was insufficient evidence that her actions had a high probability of resulting in death and that she knew her conduct endangered human life. Grossman further contends that her conviction for hit and run (count 5) must be reversed, and the jury's findings that she fled the scene of the collision (counts 3 and 4) must be vacated because there is insufficient evidence that she failed to stop immediately, and that she knew she had caused injury. We conclude that substantial evidence supports the jury's verdicts and findings and therefore reject these contentions.

### 1.  **Legal Principles**

"In reviewing a claim for sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] We review the entire record to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible and of solid value—supporting the decision

49

and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] Our application of this standard of review does not permit reweighing the evidence or reevaluating the credibility of witnesses. [Citation.] Instead, we presume the existence of every fact the jury reasonably could have deduced from the evidence in support of the judgment. [Citation.] We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity. [Citation.] And if the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citations.] Consequently, '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' [Citation.]" (*People v. Murphy* (2022) 80 Cal.App.5th 713, 725.)

### 2. <u>Analysis</u>

#### a. *Implied Malice*

##### i. <u>Substantial Evidence Supports the Jury's Finding that there was a High Probability Grossman's Actions would Result in Death</u>

Grossman contends that the murder convictions in counts 1 and 2 must be reversed because the prosecution failed to present sufficient evidence that there was a high probability her actions would result in death. The contention lacks merit.

Grossman cites to numerous cases in which courts have held that substantial evidence *supported* a conviction of implied malice murder in a vehicular manslaughter case. (*Watson*, *supra*, 30 Cal.3d 290 [defendant's blood alcohol content significantly above legal limit, defendant demonstrated pre-drinking intent to drive, nearly caused a collision, skidded to a halt in an intersection, and drove at a speed of 84 m.p.h. in a 35 m.p.h. zone]; *People v. Young* (1992) 11 Cal.App.4th 1299 [defendant led police in high-speed chase and ran four red lights]; *People v. Contreras* (1994) 26 Cal.App.4th 944 [defendant drove with a suspended license and suffered nine reckless driving citations in the year prior to the offense; disregarded warnings that the vehicle's brakes were faulty and that it should not be driven at a speed of over 15 m.p.h.; and raced another vehicle at 60 to 70 m.p.h. in a 25 m.p.h. zone]; *People v. Ortiz* (2003) 109 Cal.App.4th 104 [defendant with seven prior reckless driving incidents chased estranged wife at a speed of 100 m.p.h., tailgated, and crossed double yellow lines]; *People v. Moore* (2010) 187 Cal.App.4th 937 (*Moore*) [defendant with recent drunk driving conviction crossed a double yellow line, ran a red light, and drove at a speed of 80 to 90 m.p.h. in a 35 m.p.h. zone]; *People v. Autry* (1995) 37 Cal.App.4th 351 [defendant's blood alcohol content significantly above legal limit, defendant drove dangerously by swerving, speeding, and running a red light]; *People v. Olivas* (1985) 172 Cal.App.3d 984 [defendant led police on a high-speed chase, driving at speeds of 50 to 100 m.p.h., ran four stop signs and three red lights, hit a car prior to the fatal collision, and caused the fatal collision after running a stop sign at 57 m.p.h. in a 25 m.p.h. zone]; *People v. Talamantes* (1992) 11 Cal.App.4th 968 [defendant was significantly above the legal limit for blood

51

alcohol, speeded with headlights turned off, went "airborne" over railroad tracks, and drove on the wrong side of the road].)

Grossman argues that the facts of the above-cited cases were more egregious than the facts in this case, and she claims that the circumstances present in those cases were absent in hers. Accordingly, she believes that the evidence in her case cannot be sufficient to sustain her convictions.

Grossman misapprehends the substantial evidence inquiry—"[o]ur role in a sufficiency of the evidence review is not to engage in a comparative analysis of various cases, but rather to carefully scrutinize the record *in the instant case* for substantial evidence. . . ." (*People v. Lagunas* (2023) 97 Cal.App.5th 996, 1007.) While the precedent Grossman cites may be useful in ascertaining what types of behavior *may* contribute to a finding of implied malice, none were reversals—they do not set a threshold of egregiousness that subsequent cases must meet or exceed. " '[T]here is no particular formula for analysis of vehicular homicide cases, instead [these cases] require[e] a case-by-case approach.' ([*People v. Superior Court*] (*Costa*) [(2010)] 183 Cal.App.4th [690,] 698 [citing cases].) [In particular], lack of intoxication or the absence of driving at a high rate of speed to evade police ' "does not preclude a finding of [implied] malice." ' (*Ibid.*, quoting *People v. Contreras* (1994) 26 Cal.App.4th 944, 955.)" (*People v. Murphy, supra*, 80 Cal.App.5th at p. 727.)

Here, the evidence demonstrated that Grossman was near or above the legal limit for blood alcohol content[8] at the time of

---

[8] Vehicle Code section 23152, subdivision (b) provides: "It is unlawful for a person who has 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle."

the collision—a blood test showed her blood alcohol content several hours after the crash at the legal limit, and the two PAS breath tests administered in the field showed her hovering just below the legal limit right after the fatal collision.[9] As the prosecution's experts testified, having a blood alcohol content below the legal limit does not preclude intoxication or impairment.[10] "Driving is one of the most complex and

---

[9] The evidence suggested that Grossman's PAS tests may not have accurately reflected her level of intoxication. During the PAS test, Deputy Kelley had to repeatedly admonish Grossman to blow into the device. At trial, Deputy Kelley testified: "In a way she wasn't providing an adequate sample; so I don't know if she was trying to trick the system and trying to get like a lower reading because the system knows it needs a full breath of air to get an accurate reading. So by blowing more air through, you're getting air from your deep lungs, you're getting the most alcohol for or exchanges from your blood vessels to the air, and that's what we're trying to look for in that. By providing a little small breath like that, it also triggers the machine, but you're not getting an actual reading of her blood-alcohol content." The jurors were free to determine whether the PAS results accurately reflected Grossman's true blood alcohol content. Other evidence, including expert testimony regarding how much alcohol a person of Grossman's size would have to consume to have a blood alcohol content of 0.08 percent over three hours after the collision, suggests that the PAS tests were not an accurate reflection of her blood alcohol content and that her statements to authorities regarding how many drinks she consumed (which were already undermined by the testimony of eyewitnesses) were false.

[10] Moreover, whether someone is unlawfully driving under the influence is not determined by blood alcohol content. "[Vehicle Code] [s]ection 23152[, subdivision] (a) makes it unlawful for 'a person who is under the influence of any alcoholic

53

potentially dangerous tasks that individuals undertake on a regular basis." (*People v. Saucedo* (2023) 90 Cal.App.5th 505, 514 (*Saucedo*).)  A lesser blood alcohol content may cause impairment of the ability to drive and the ability to make sound decisions. Although Deputy Michael Kelley characterized Grossman's coordination as "fair" when he administered the FST an hour after the collision, Grossman exhibited multiple signs of intoxication while performing the test.  Several expert witnesses testified that a person may perform fairly well during FST's, but still be mentally impaired to drive.  Deputy Kelley also observed that Grossman's eyes were watery and droopy, her speech was mumbled, and a smell of alcohol emanated from her person. Grossman admitted to drinking a margarita prior to driving, and other evidence indicated that she drank a greater amount of alcohol.  The evidence demonstrated that Grossman fully depressed the Mercedes's accelerator as she entered an intersection with a crosswalk in a populated residential area. Four witnesses specifically described her as "racing" Erickson, who was just ahead of her.  All of the witnesses described the two SUV's as driving at excessive speeds very close together. Grossman reached a speed of 81 miles per hour in a 45 mile-per-

---

beverage to drive a vehicle.'  Under this provision, the People must prove that:  '(1) a person, (2) while under the influence of alcohol, (3) drove a vehicle.' (*People v. McNorton* (2001) 91 Cal.App.4th Supp. 1, 5; see CALCRIM No. 2110.)  A person is 'under the influence' of alcohol when he or she ' "no longer has the ability to drive a vehicle with the caution characteristic of a sober person of ordinary prudence under the same or similar circumstances." ' (*People v. Weathington* (1991) 231 Cal.App.3d 69, 78.)" (*People v. Grabham* (2021) 68 Cal.App.5th 549, 553.)

hour zone.  The evidence that Grossman drove in a highly dangerous manner while impaired was more than sufficient to sustain the jury's finding that it was highly probable Grossman's conduct would result in death.

We are not otherwise persuaded by Grossman's citation to the 1981 dissent of Chief Justice Bird in *Watson*, *supra*, 30 Cal.3d 290, that "[d]eath or injury is not the probable result of driving while under the influence of alcohol.  'Thousands, perhaps hundreds of thousands, of Californians each week reach home without accident despite their driving intoxicated.' " (*Id*. at p. 305 (dis. opn. of Bird, C. J.), quoting *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 907 (dis. opn. of Clark, J.).)  Dissenting opinions are not authority.  Moreover, the Chief Justice's remarks refer solely to driving while intoxicated, and not to driving *at excessive speeds in a residential neighborhood* while intoxicated as Grossman did.

We also reject Grossman's assertion that the evidence showed speeding along Triunfo Canyon Road was common, but that the prosecution presented no evidence that fatalities had occurred—"undoubtedly because [fatalities were] statistically improbable."  The portion of the trial transcript to which Grossman refers as evidence is Pamela Curry's testimony that she saw Grossman and two other cars racing along Lindero Canyon Road as they turned onto Triunfo Canyon Road.  Curry testified that she initially thought "it was younger people racing.  Because that's quite common out in the canyons during the pandemic."  Curry's isolated anecdotal comment that she believed it was common to race "out in the canyons" provides no evidence of the level of danger posed by someone driving impaired at excessive speeds at the particular residential intersection where

55

the collision occurred, and does not demonstrate that fatalities were "undoubtedly . . . statistically improbable."

ii.    Substantial Evidence Supports the Jury's Finding that Grossman Knew her Conduct Endangered Human Life

We also reject Grossman's argument that there was insufficient evidence to support the finding that she knew her conduct was dangerous to human life.

" 'Implied malice is determined by examining the defendant's subjective mental state to see if he or she actually appreciated the risk of his or her actions.' [Citation.] 'It is not enough that a reasonable person would have been aware of the risk.' (*Moore*[, *supra*,] 187 Cal.App.4th [at p.] 941. . . .) . . . 'It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence.' [Citations.]" (*People v. Jimenez* (2015) 242 Cal.App.4th 1337, 1358.) Moreover, " 'a finding of implied malice in the context of vehicular murder does not require 'a "predicate act" ' such as a prior driving under the influence (DUI) conviction, a DUI-related accident, or a judicial or drug rehabilitation-related admonition of the dangers of driving while intoxicated. (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091–1092.)" (*People v. Murphy*, *supra*, 80 Cal.App.5th at p. 728.)

In *Moore*, *supra*, 187 Cal.App.4th at page 939, the defendant drove 70 miles per hour in a 35 mile-per-hour zone, ran a red light, and struck and killed another motorist. Moore

56

was not intoxicated.  (*Id.*, at p. 940.)  He told the police he did not intend to kill anyone.  (*Ibid.*)  The jury convicted Moore of second degree murder, and the Court of Appeal affirmed.  (*Ibid.*)  The appellate court held that Moore's conduct "went well beyond gross negligence. . . . [¶] Whether Moore was subjectively aware of the risk is best answered by the question:  how could he not be?  It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, Moore was aware of the risk."  (*Id.* at p. 941.)

The facts of this case are similar, but more egregious.  Grossman drank enough to achieve a blood alcohol content at or just below the legal limit of 0.08 over an hour after the collision.  There is evidence that her blood alcohol content may have been significantly higher than her PAS tests reflected.  After drinking, Grossman got into her car and raced Erickson through residential streets.  She was in her own neighborhood, less than a mile from her home.  From that fact, the jury could readily infer that Grossman knew the area would be populated and knew that she was approaching a crosswalk where pedestrians could be present.  Despite this, she depressed the gas pedal to the floor and accelerated to speeds of up to 81 miles per hour.  As was the case in *Moore*, "Whether [Grossman] was subjectively aware of the risk is best answered by the question:  how could [s]he not be?  It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [Grossman] was aware of the risk."  (*Id.* at p. 941.)

Finally, substantial evidence shows that Grossman acted with conscious disregard for human life.  "[I]mplied malice may be inferred from a defendant's conduct before, during, and after" the killing.  (*People v. Carr* (2023) 90 Cal.App.5th 136, 139; see

57

also *People v. Cravens* (2012) 53 Cal.4th 500, 511 ["defendant's behavior before and after the fight further . . . bolstered the finding of implied malice"].)  Grossman appreciated the risk her conduct posed but chose to race through the intersection.  She briefly tapped her brakes before the collision and did not attempt to stop her vehicle even after her airbags deployed and she knew she had struck something.  Three-tenths of a mile from the intersection (and approximately halfway to back to Grossman's home), Mercedes disabled Grossman's vehicle and she was forced to pull over.  In the hospital, after Grossman had been arrested for driving under the influence and causing a fatal accident, Grossman told emergency medical technician Teryl Grasso that if her car had not been rendered inoperable she would be at home in her garage.  The clear implication of her statement was that she was not concerned about the consequences of her life-endangering actions, even when she knew that she had killed at least one human being.

b.      *Hit and Run / Fleeing the Scene*

Grossman next contends that the evidence was insufficient to prove the charge that she failed to immediately stop at the scene of the accident (Veh. Code, § 20001, subd. (b)(2), count 5), as well as the allegations that she fled the scene (Veh. Code, § 20001, subd. (c), counts 3 & 4).

Vehicle Code section 20001, subdivision (a) provides:  "The driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in the death of a person shall *immediately stop* the vehicle at the scene of the accident and shall fulfill the requirements of Sections 20003 and 20004[,]"

58

which include rendering aid, providing certain information to others involved and to law enforcement, and reporting the accident to law enforcement if authorities are not on the scene. (Italics added.)

i.      Failure to Immediately Stop

Grossman primarily contends that there is insufficient evidence that she failed to immediately stop.  The jury was instructed pursuant to CALCRIM No. 2140 that "[t]he duty to *immediately stop* means that the driver must stop his or her vehicle as soon as reasonably possible under the circumstances." (Italics in original.)

Grossman argues that it was not reasonably possible for her to pull her car over until she had driven three-tenths of a mile beyond the scene of the collision.  She asserts that the car's airbags deployed, hitting her in the face and legs and causing her to become confused.  Grossman argues that when Mercedes contacted Fire Dispatch, the dispatcher directed Grossman to stay where she was.  Grossman complied and cooperated with law enforcement.  Grossman claims that although there was evidence that her vehicle was still operable, she "did not attempt to drive her vehicle away, or flee on foot, even after she learned that children might have been hit."

Grossman's arguments rely on evidence that the jury gave no weight, and ignore the substantial evidence that supports the verdict and findings:  The evidence shows that before hitting the boys, Grossman tapped her brakes briefly, and that she was still traveling at a speed of 73 miles per hour with her foot off the brakes when she struck them.  This occurred on a residential

street where the speed limit was 45 miles per hour.  Grossman pulled over only after Mercedes rendered her car inoperable.  By that time, Grossman had driven well beyond the scene of the collision and approximately half of the distance to her home. There is no evidence that she attempted to stop her Mercedes at *any* point before it was rendered inoperable.  Experts for the prosecution testified that Grossman had the ability to apply her brakes after her car's emergency procedures initiated, and that if she had done so, she would have stopped sooner.  Finally, at the hospital, after learning that she had hit someone at excessive speed and killed them, Grossman stated that if Mercedes had not disabled her car she would be at home in her garage, from which the jury could reasonably infer that Grossman had not intended to stop, let alone attempted to do so.

ii.      Knowledge of Injury

Grossman suggests there was insufficient evidence that she knew she hit and injured a person based on her statements to the fire dispatcher that she did not know what she hit.[11]  This assertion, too, ignores the substantial evidence in the record that supports the jury's verdict and findings.

"[K]nowledge of injury is an essential element of the crime proscribed by [Vehicle Code section 20001].  [Citations.]  Usually, however, such knowledge must be derived from the surrounding facts and circumstances of the accident.  [Citation.]  Yet the driver who leaves the scene of the accident seldom possesses

_____

[11] Grossman does not develop this argument in the opening brief, but because the People make the counterargument we address it in the interest of completeness.

60

actual knowledge of injury; by leaving the scene he forecloses any opportunity to acquire such actual knowledge. Hence a requirement of actual knowledge of injury would realistically render the statute useless. . . . [T]herefore . . . criminal liability attaches to a driver who knowingly leaves the scene of an accident if he actually knew of the injury or if he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person." (*People v. Holford* (1965) 63 Cal.2d 74, 79–80, fn. omitted.)

There is ample evidence of the circumstances surrounding the collision to support the jury's finding that, at the very least, Grossman knew the nature of the collision was such that she would have reasonably anticipated that someone had been severely injured or killed as a result. Grossman was traveling a very short distance from her home in a residential area frequented by pedestrians and cyclists. It could be readily inferred that Grossman was familiar with these conditions, knew that people would be out recreating, and that she was aware her air bags deployed as she drove through a crosswalk where people were likely to be present. She struck two children at a very high rate of speed. The impact was such that Jacob was thrown 70 feet and Mark came to rest 254 feet from the crosswalk. The damage to Grossman's car was extensive. Grossman knew that her car's safety system alerted Mercedes and disabled the vehicle. There was overwhelming circumstantial evidence from which the jury could conclude that Grossman knew she struck a person.

61

## C.  *Motion for New Trial (Subjective Implied Malice)*

Grossman next contends that the court abused its discretion by denying her motion for new trial because the trial court relied on *Moore*, *supra*, 187 Cal.App.4th 937, when it found there was substantial evidence that Grossman was subjectively aware that her conduct endangered human life.  We have already held that substantial evidence supports the jury's finding and will not revisit the issue here.

As is clear from our discussion of the sufficiency of the evidence of Grossman's subjective awareness in Section (B)(2)(a)(i), *supra*, we find *Moore* persuasive, and thus do not believe that it was an abuse of discretion for the trial court to rely on *Moore's* reasoning.  *Moore* does not misstate the law.  The *Moore* court expressly stated that it was not sufficient to apply an objective standard.  (*Moore*, *supra*, 187 Cal.App.4th at p. 941 ["It is not enough that a reasonable person would have been aware of the risk"].)  *Moore* held that the facts before it were so egregious that *any* human being—not only the reasonable, objective person—would know that their conduct endangered human life, and if any person would know this from the circumstances, it could be inferred that the defendant subjectively knew he was endangering human life as well.  (*Id*. at p. 941.)  There are no published cases that question *Moore's* holding, and multiple cases that cite *Moore* for this exact proposition.  (*Carpenter v. Superior Court* (2023) 93 Cal.App.5th 1279, 1309; *Saucedo*, *supra*, 90 Cal.App.5th at p. 513; *People v. Murphy*, *supra*, 80 Cal.App.5th at p. 728; *People v. Latham* (2012) 203 Cal.App.4th 319, 332; *People v. Canizalez* (2011) 197 Cal.App.4th 832, 843.)  As we have discussed, the facts of Grossman's case are more egregious than

62

the facts in *Moore*. The trial court did not err in relying on *Moore* in denying the motion for new trial.

## D. *Admission of Evidence*

Grossman contends that the trial court improperly admitted evidence of a speeding citation that she received in 2013, evidence of her drug and alcohol impairment, and a statement that Grossman made to emergency medical technician Teryl Grasso in the hospital following the collision. We find no abuse of discretion.

### 1. 2013 Speeding Citation

#### a. *Legal Principles*

"Evidence Code section 1101, subdivision (a) generally prohibits the admission of evidence of specific instances of a person's conduct 'to prove his or her conduct on a specified occasion.' Section 1101, subdivision (b), however, clarifies this rule by allowing 'admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as . . . intent, . . . knowledge, . . . absence of mistake or accident . . .) other than his or her [pre]disposition to commit such an act.' 'Although a prior criminal act may be relevant for a noncharacter purpose to prove some fact other than the defendant's criminal disposition, the probative value of that evidence may nevertheless be counterbalanced by [an Evidence Code] section 352 concern. Evidence may be excluded under [Evidence Code] section 352 if its probative value is

"substantially outweighed by the probability that its admission
[would] . . . create substantial danger of undue prejudice, of
confusing the issues, or of misleading the jury." ' [Citation.]"
(*Saucedo*, *supra*, 90 Cal.App.5th at pp. 515–516.) "We review for
an abuse of discretion a trial court's admission of evidence."
(*People v. Booker* (2011) 51 Cal.4th 141, 170.)

b.    *Proceedings*

Before trial, Grossman moved to exclude evidence of her
prior citations for speeding.  The parties disagreed as to whether
the evidence should be excluded pursuant to *Saucedo*, *supra*, 90
Cal.App.5th 505, or admitted pursuant to *People v. Ortiz*, *supra*,
109 Cal.App.4th 104.[12]  At a hearing on the matter, the trial
court stated that it did not view the two cases as conflicting.  The
court explained:  "I think the main issue is—and this is I think
quoting both *Ortiz* and *Saucedo*, whether the prior incidents tend
to establish a subjective awareness on the part of the defendant
of the disastrous consequences that can follow from recklessly
operating a motor vehicle on a public highway" . . . "Do they, you
know, establish knowledge basically gained in the course of the
prior misconduct of the natural consequences, dangerous to
human life, of the reckless operation of a motor vehicle and the
defendant's persistence in that behavior?  So that's basically
showing a conscious disregard for the lives of others on the road."
The court cited the general rule that, under Evidence Code
section 1101, subdivision (a), evidence of conduct on an earlier
occasion is not admissible to prove that the defendant would have

---

[12] We discuss *Saucedo* in the Analysis section below.

engaged in that conduct on a later occasion.  The court noted that the exception to that general rule is that the evidence may be used to establish knowledge, and knowledge relating to implied malice, as discussed in *Ortiz*.  *Saucedo* held that the circumstances must actually impart knowledge of the consequences.

With respect to the evidence before it, the court excluded the speeding citations in which there was no evidence that Grossman was warned regarding the potential consequences of her conduct.  The court also excluded several of the citations as remote in time pursuant to Evidence Code section 352.  The court admitted evidence of a 2013 citation for speeding, because in that instance the officer advised Grossman that if she continued speeding she could kill someone.  Grossman responded to this warning by telling the officer that she hoped he never needed the services of the Grossman Burn Center.

The court stated that its admission of evidence of the 2013 citation was distinguishable from the admission of evidence in *Saucedo* because the citation was accompanied by a warning of the life-threatening consequences of speeding.  There was no evidence that the defendant in *Saucedo* received similar warnings.  That the evidence may be remote went to its weight, not its relevance.  The court stated it would instruct the jury that the evidence was to be considered only for knowledge and implied malice.  The court stated, "As for [Grossman's] response to the officer, I think it arguably shows indifference to the warning which in this court's view is highly relevant to conscious disregard.  So I think it outweighs any risk of undue prejudice caused by the nature of the remark."

At trial, Officer Leffler testified that Grossman was driving 92 miles per hour on the highway when he issued the citation—27 miles per hour above the posted 65 mile per hour speed limit. Officer Leffler's standard practice was to warn that "speed in excess only contributes to a greater chance of collision, and those collisions often result in injury and/or death depending on how severe it is." He also testified that Grossman became "frustrated to a degree and made a voluntary statement that she hopes I don't need the use of the [Grossman] Burn Center in the future."

c.      *Analysis*

On appeal, Grossman relies on *Saucedo, supra*, 90 Cal.App.5th 505, to support her argument that the evidence of her 2013 speeding citation was admitted in error. In *Saucedo*, the prosecution sought to admit nine prior driving and methamphetamine offenses that the defendant had committed in the five years prior to the offense. (*Id.* at pp. 510–511.) "The prosecution argued the incidents were relevant 'to the subjective knowledge of implied malice as it tends to show that the defendant's arrests, prosecutions, convictions, probations, and license suspensions would clearly demonstrate the dangerousness of drunk [*sic*] driving given the consequences the defendant faced on the prior occasions.'" (*Id.* at p. 516, fn. omitted.) The Court of Appeal held that the trial court's admission of these arrests and citations, none of which resulted in " 'prosecutions, convictions, probations' or other 'consequences' " was error. (*Ibid.*, fn. 6.) The court reasoned that the incidents were much less serious than the incident that resulted in death, that there were no injuries or serious consequences, and that the defendant was not required to

66

participate in any educational programs regarding his driving. (*Id*. at p. 518.) The court concluded: "In sum, none of the incidents admitted at trial were 'encounters with the consequences of recklessness on the highway' from which jurors could reasonably infer appellant was 'sensitize[d] . . . to the dangerousness of such life-threatening conduct.' (*Ortiz*, *supra*, 109 Cal.App.4th at p. 112.)" (*Ibid*.)  However, the court held that the error was harmless because "the evidence supports the finding of implied malice without consideration of any of [the defendant's] prior driving conduct." (*Ibid*.)

The evidence in Grossman's case is qualitatively different from that in *Saucedo*.  In *Saucedo*, there was no evidence that law enforcement warned the defendant that excessive speed leads to collisions that often result in injury and/or death.  One of the factors that the *Saucedo* court relied on in finding error was that there was no evidence that the defendant had been educated that death is a consequence of speeding.  (*Saucedo*, *supra*, 90 Cal.App.5th at p. 518.)  Here, Grossman was explicitly warned that speeding increased the incidence of collisions resulting in death.  Moreover, the degree of dangerousness of the prior incident functions differently in this case than it did in *Saucedo*. There, the conduct was less dangerous *and* the appellate court concluded that there was *no* evidence of serious consequences or education that serious consequences could result that would serve as a warning.  In contrast, here the prior conduct was less dangerous and there *was* evidence that Grossman was warned death could result.  The jury could reasonably infer that because Grossman knew death could occur in a less dangerous situation, Grossman also knew death was even more likely to occur under the very dangerous circumstances she created.

67

Grossman's argument that she was not warned that driving while intoxicated could also result in death fails for similar reasons. Knowing that excessive speeding alone could cause death, Grossman must have understood that excessive speeding while intoxicated could also cause death. Additionally, there was evidence that after Officer Leffler advised Grossman of the deadly consequences of speeding, Grossman threatened the officer in a manner that suggested she believed the deadly consequences of speeding were something she could disregard. Officer Leffler's warning was evidence that Grossman was aware that speeding could result in death. Grossman's response evidenced her conscious disregard that her actions endangered human life. Both were highly relevant.

Finally, even if error, admission of the evidence of Grossman's 2013 speeding citation was harmless. As in *Saucedo*, "the evidence supports the finding of implied malice without consideration of any of [Grossman's] prior driving conduct." (*Saucedo*, *supra*, 90 Cal.App.5th at p. 518.) We have discussed the substantial evidence of Grossman's knowledge that her driving endangered human life. Grossman demonstrated conscious disregard by driving in a manner that endangered human life despite that knowledge. Additionally, Grossman left the scene without attempting to stop. She pulled over only after her car was disabled by Mercedes. At the hospital, after Grossman was told that she had killed someone, she complained that if her car had not been disabled she would be at home in her garage. Her actions and statements following the collision provide substantial evidence of her conscious disregard for human life, even absent evidence of her encounter with Officer Leffler.

68

Moreover, the jury was specifically instructed with regard to the 2013 citation that it could only consider the evidence for the limited purpose of determining whether Grossman knew her actions were dangerous to human life when she acted. The jury was admonished, "Do not conclude from this evidence that the defendant has a bad character or is disposed to commit a crime." The jury is presumed to have understood and followed the court's instructions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.)

## 2. Evidence of Alcohol and Drug Impairment

### a. *Legal Principles*

#### i. Vehicle Code Section 23152

Vehicle Code section 23152 describes two separate offenses relating to driving and alcohol consumption. Vehicle Code section 23152, subdivision (a) makes it "unlawful for a person who is under the influence of any alcoholic beverage to drive a vehicle." "Under [Vehicle Code section 23152, subdivision (a)], the People must prove that: '(1) a person, (2) while under the influence of alcohol, (3) drove a vehicle.' [Citation.] A person is 'under the influence' of alcohol when he or she ' "no longer has the ability to drive a vehicle with the caution characteristic of a sober person of ordinary prudence under the same or similar circumstances." ' [Citation.]" (*People v. Grabham* (2021) 68 Cal.App.5th 549, 553.)

Vehicle Code section 23152, subdivision (b) makes it "unlawful for a person who has 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle." "In contrast [to

subdivision (a)], the 'per se' DUI statute under Vehicle Code section 23152, subdivision (b), requires proof that a defendant has been driving with a blood-alcohol level over the legal limit. If the limit is exceeded, the statute is violated, and no additional proof of the defendant's impairment is required." (*People v. Randolph* (2018) 28 Cal.App.5th 602, 620, fn.15.)

## ii. People v. Watson

In *Watson*, *supra*, 30 Cal.3d 290, the defendant was charged with second degree implied malice murder and vehicular manslaughter. (*Id.* at p. 293.) Following a preliminary hearing, the magistrate determined that the facts were insufficient to establish implied malice, and dismissed the second degree murder charges. (*Id.* at p. 294.) The People appealed the magistrate's dismissal order, and the Supreme Court reversed. (*Ibid.*)

As pertinent here, the Supreme Court held that the facts were sufficient to sustain a murder charge: "Defendant had consumed enough alcohol to raise his blood alcohol content to a level which would support a finding that he was legally intoxicated. He had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later. It also may be presumed that defendant was aware of the hazards of driving while intoxicated. As we stated in *Taylor v. Superior Court* (1979) 24 Cal.3d 890, 897: 'One who willfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed,

70

reasonably may be held to exhibit a conscious disregard of the safety of others.' Defendant drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death. Defendant nearly collided with a vehicle after running a red light; he avoided the accident only by skidding to a stop. He thereafter resumed his excessive speed before colliding with the victims' car, and then belatedly again attempted to brake his car before the collision (as evidenced by the extensive skid marks before and after impact) suggesting an actual awareness of the great risk of harm which he had created. In combination, these facts reasonably and readily support a conclusion that defendant acted wantonly and with a conscious disregard for human life." (*Id*. at pp. 300–301.)

### iii.    Admission of Evidence

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " 'Evidence is substantially more prejudicial than probative . . . [citation] [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation.]' [Citation.] ' "The prejudice which . . . Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' [Citations.]"

71

(*People v. Eubanks* (2011) 53 Cal.4th 110, 144.) " 'Trial courts enjoy " 'broad discretion' " in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.]' [Citation.]" (*People v. Snyder* (2016) 1 Cal.App.5th 622, 632.)

### b.    *Proceedings*

Prior to trial, Grossman filed a motion in limine to exclude evidence relating to benzodiazepines, evidence of her blood alcohol content, and evidence of her consumption of alcohol or drugs.  The prosecution opposed the exclusion of this evidence.

At the hearing, defense counsel argued that evidence relating to benzodiazepines should be excluded as speculative and highly prejudicial pursuant to Evidence Code section 352. Counsel argued that the prosecution's confirmatory tests provided no evidence of the quantity of diazepam or benzodiazepines found in Grossman's blood.  The prosecution's expert could testify that these substances may cause impairment, but the expert could not render an opinion as to whether Grossman was impaired, and could not tell if Grossman ingested both drugs or if one drug was a metabolite of the other.  Counsel also argued that the Los Angeles County Sheriff's Department's laboratory was unable to confirm the quantity of drugs in Grossman's blood.  A Sheriff's Department employee could testify there was the potential for an additive effect when drugs and alcohol were both present in the blood, but could not specify which drug Grossman took.  There was no evidence that

Grossman ingested benzodiazepines apart from the blood test results.[13]

In response, the prosecutor explained that drug impairment as defined by law is determined by the totality of the circumstances—field sobriety tests, the defendant's answers to questions, and observations—not drug content percentage in the blood. If an officer has reason to believe that a person is impaired based on the totality of the circumstances, the person's blood is tested for the absence or presence of a substance, but not for quantity. This is due to the wide variation in the effect of drugs on individuals.

The court ruled the benzodiazepines evidence admissible under Evidence Code section 352. The court explained that the People had a qualified expert who could testify that a combination of drugs and alcohol can increase impairment. Defense counsel would have the opportunity to cross-examine that expert.

With respect to blood alcohol content results, defense counsel highlighted that the People had not charged Grossman with driving under the influence (Veh. Code, § 23152, subd. (a)), driving with excessive blood alcohol content (Veh. Code, § 23152, subd. (b)), or gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)). The prosecution was instead using

---

[13] Defense counsel also argued that the police exceeded the scope of the warrant and tested for drugs without giving a drug admonition. The court stated that counsel should file a separate motion to raise the issue of defects in the warrant pursuant to *Franks, supra,* 438 U.S. 154 if counsel wished to argue the issue. Grossman filed a motion to traverse, which we address in Section G.

impairment evidence to prove malice and reckless disregard in counts 1 through 4 (implied malice murder (counts 1 & 2); gross vehicular manslaughter (counts 3 & 4)).  Counsel argued that to meet the requirements for implied malice under *Watson*, *supra*, 30 Cal.3d 290, the prosecution had to demonstrate more than possible impairment—the defendant had to be legally intoxicated, either because she had been driving under the influence (Veh. Code, § 23152, subd. (a)) or had a blood alcohol content of 0.08 percent or greater (Veh. Code, § 23152, subd. (b)).  Counsel accused the prosecution of trying to "inject evidence [into the trial] of 'D.U.I. light,' like, 'Well, no, it's not impairment to the degree where its illegal.  There is no illegality about it, but the jury can take this and run with it.'  And under *Watson* . . . that's not proper.  Their evidence doesn't clear the hurdle that *Watson* establishes of showing intoxication. [¶] And if you look at the *Watson* cases, there are cases where people were intoxicated over one or both of those legal limits.  There are cases where people had prior D.U.I.'s.  But to my knowledge there is no case where a court admitted evidence in a *Watson* prosecution of social drinking not rising to the level of illegality."

The court disagreed with counsel that evidence of alcohol impairment was irrelevant to malice or gross negligence unless a defendant was intoxicated beyond the legal limit:  ". . . I disagree with one fundamental assertion that you make, which is . . . that evidence of illegal intoxication is, like you said, a .08, or, you know, within D.U.I. laws—might tend to prove malice or gross negligence but evidence of potential impairment or alcohol consumption within legal limits would not.  And I disagree with that.  I think it's—the standards for malice or gross negligence doesn't necessarily require intoxication over the legal limits or for

74

the defendant to be—to have violated any of the D.U.I. statutes. [¶] If there is any impairment, if there is any drinking that could potentially lead to impairment, that in my view would be relevant to malice. Is it as serious as a situation where the defendant has a high [blood alcohol content]? No. But the People are entitled to make that argument as one of the maybe many factors that they are going to argue lead to malice or at least gross negligence. [¶] So I do think it's relevant whether or not it reaches the standard for charging her with a separate offense."

Defense counsel argued that *Watson* required evidence that the defendant was legally intoxicated—either because the defendant was unable to drive a car safely or was driving with an excessive blood alcohol level. Additionally, the defendant had to subjectively appreciate the risk that the defendant was creating, and to drive anyway. Counsel argued that without evidence of both, the threshold for proving implied malice is not met, and the jury is invited to speculate whether it is possible that there was impairment. Counsel emphasized that Grossman had no prior convictions for driving under the influence and had not participated in any drinking and driving education.

Counsel warned that admitting the impairment evidence would be "a slippery slope, inviting the jury to maybe become confused and misled, when we talk about things like 'intoxication,' 'impairment,' 'under the influence,' 'per se violation.' . . . [W]hat do those things mean and what's their significance? [¶] And it's something that it is a very significant threat to due process in a fair trial in this case when that evidence comes in and it doesn't meet the legal standards and the jury is sort of supposed to take it and run with it. And again, I urge the court to look at it through the lens of [Evidence Code

section] 352, and this is minimally probative value, arguably toward malice that it has, again, if they can show the subjective element of appreciating the person was unfit to get behind the wheel and again the jury thinking 'oh, there is alcohol on board, you know, that's horrible' when that's not really the situation here."

The court reiterated that it disagreed with counsel that *Watson* required legal intoxication to show implied malice. The court explained that many factors can contribute to malice and gross negligence, and that here impairment was one of several factors that supported the prosecution's theory of guilt. The court ruled that the prosecution was prohibited from presenting evidence that Grossman could have been charged with driving under the influence or that her blood alcohol content was over the legal limit for driving. However, the court permitted the prosecution to introduce evidence of the quantity of Grossman's blood alcohol content, impairment evidence, and evidence of Grossman's consumption of alcohol and/or drugs. The court assured defense counsel: "[T]he court will be very careful to make sure counsel don't talk about issues that are irrelevant, including legal standards for D.U.I. and driving under the influence when those are not charged." "We're not going to turn this into a DUI trial."

   c. *Analysis*

Grossman contends that the trial court abused its discretion by admitting evidence that she was impaired by

76

alcohol and benzodiazepines.[14] The trial court did not abuse its discretion.

At the hearing, Grossman primarily argued that the impairment evidence had little probative value because "some" impairment evidence is insufficient to support a conviction for implied malice murder. Grossman claimed that under *Watson*, *supra*, 30 Cal.3d 290, the prosecution had to show she was legally intoxicated—either because she was driving "under the influence" as that phrase is legally defined or that she had a blood alcohol content of 0.08 percent or higher. Grossman does not mention *Watson* in the opening brief, and does not challenge the trial court's legal conclusion that, when combined with evidence of other contributing factors, evidence of "some" impairment may be sufficient to establish implied malice, and is therefore relevant. Grossman intimates that it was improper for the trial court to admit impairment evidence not rising to the level of legal

---

[14] In her opening brief, Grossman provides only an abbreviated summary of the hearing and the court's rulings. We decline to address arguments related to proceedings that are not included in the opening brief. This includes, but is not limited to, retrograde extrapolation of blood alcohol content evidence. (See *LNSU #1, LLC v. Alta Del Mar Coastal Collection Community Assn.* (2023) 94 Cal.App.5th 1050, 1071[appellants who "barely discuss[ed]" proceedings and did not reference the trial court's ruling did not meet their burden on appeal].) We also decline to address the issues that Grossman raises for the first time on appeal, including, but not limited to, her argument that the jury was not instructed on the legal definition of impairment. (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1208 [defendant must make a timely and specific objection to preserve an issue for appellate review].)

impairment because the prosecution had not charged her with offenses involving driving under the influence, but she has waived any challenge by failing to offer substantive arguments or citation to authority supporting her position. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684 [this court will not develop an appellant's arguments; undeveloped, unsupported arguments are waived]; see also Cal. Rules of Court, rule 8.204(a)(1)(B) [briefs must "support each point by argument and, if possible, by citation of authority"].)

Grossman contends that the impairment evidence was problematic because it was not accompanied by evidence demonstrating that she subjectively knew the acts of drinking and driving or drinking and driving with Valium in her system were dangerous to human life. As we have discussed, there was substantial evidence to support the jury's finding that Grossman knew her driving was dangerous to human life. Regardless, we reject the contention. Under Evidence Code section 352, the inquiry is whether the evidence in dispute has probative value that is greater than its potential for prejudice. Grossman argues only that the impairment evidence was contradicted by other evidence in the record. This argument concerns the weight of the evidence, not its admissibility. Moreover, Grossman fails to demonstrate that she was prejudiced. Undue prejudice does not result from the admission of relevant contradictory evidence. A defendant is only prejudiced by evidence that " 'uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' [Citation.]" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

Finally, we reject Grossman's assertion that the trial court permitted the proceedings to turn into a DUI trial because the court allowed the prosecution to call numerous witnesses who testified regarding Grossman's consumption of alcohol, field sobriety tests, and/or about drug and alcohol impairment. The court's ruling did not prohibit admission of any and all evidence that would have also been relevant in a DUI trial; it prohibited evidence that Grossman's impairment was *illegal*, which it determined was not relevant in the absence of DUI charges. Grossman does not contend that the prosecution introduced evidence that her impairment was illegal, either because she was driving under the influence as legally defined or because her blood alcohol content was above the legal limit. There is no merit to her claim that the court allowed proceedings to turn into a DUI trial.

### 3. Teryl Grasso's Testimony

#### a. *Proceedings*

##### i. Grasso Interview

Detective Michael Takacs and two District Attorneys conducted a recorded telephonic interview with Teryl Grasso, the emergency medical technician who processed Grossman's intake to the emergency room following the collision. Grasso stated that she was taking Grossman's vital information when Grossman suddenly started telling Grasso that OnStar disabled her vehicle and that she would be in her garage right now if her car had not been disabled. Grasso recounted to the officers the events in the

79

emergency room that night, including statements relayed to her by co-workers. Grasso said that she was traumatized by her interaction with Grossman and had to seek therapy for six to nine months to be able to speak about the night of the collision without crying. Grasso had delayed reporting Grossman's statements and behavior because Grasso was not sure if she would be violating laws that protect the privacy of patients seeking medical care, and because the events were very hard for Grasso to speak about. Grasso said that before therapy, she felt compelled to "stalk the news" to see if Grossman had been charged. Soon after she finished therapy, Grasso felt able to speak to her manager about her experience. Grasso's manager urged her to come forward and make a statement, so she did.

## ii. Motion to Exclude Evidence and Hearing

During trial, Grossman moved to exclude as irrelevant all of Grasso's testimony relating to Grossman's statements and behavior on the night of the collision. In the motion, Grossman argued that her post-incident conduct was not probative of her subjective awareness that her conduct was dangerous to life before the collision. In the event that the trial court refused to exclude Grasso's testimony entirely, Grossman requested that the trial court exclude testimony relating to ten statements Grasso made in the interview, including statements that Grasso sought therapy to process her feelings about her interaction with Grossman.

At a hearing on the matter, the court found the statement that Grossman would be in her garage if her car had not been disabled by OnStar to be highly relevant to the hit and run

80

charge and enhancements. The court noted that Grossman made the statement soon after the collision. The court excluded testimony regarding all statements that defense counsel specifically objected to (other than Grossman's comment to Grasso that she would be in her garage if her car had not been disabled), as well as all speculation and hearsay about the events of that night, but permitted the prosecution to elicit any of Grasso's direct observations of Grossman's "visual signs of impairment[,]" including her observation that Grossman was laughing in the emergency room.

The prosecutor stated that she did not intend to elicit on direct examination testimony that Grasso sought therapy following the encounter, but if defense counsel elicited that Grasso waited three years to come forward with the information, the prosecutor believed Grasso should have the opportunity to explain her delay. The court excluded the therapy testimony but agreed to revisit the issue if the defense raised the issue of Grasso's delay in reporting.

### iii.    Trial

At trial, Grasso testified that she collected Grossman's vital information on the night of the collision. When Grossman was first brought in, Grasso did not know Grossman was the driver in the fatal collision. Grasso realized Grossman was involved when Grossman spontaneously said to her, " 'If they didn't disable my car, I would be at home in my garage right now.' "

On cross-examination, defense counsel asked Grasso if she had been "stalking the news about this case." Grasso responded, "I was stalking the news at the beginning, and—had to go to

81

therapy to—" Defense counsel objected to Grasso's response and the trial court struck the portion of Grasso's testimony relating to therapy. The court instructed the jury to disregard the stricken testimony.

Defense counsel asked Grasso if she "looked [Grossman] up" and learned that Grossman was wealthy. Grasso explained that she did not look Grossman up. She saw Grossman's name and realized that she was connected to the Grossman Burn Institute.

Defense counsel then resumed questioning Grasso about "stalking the news":

"[Defense Counsel:] Okay. So when you say you were stalking the news, can you explain to me what that means? Since those are your words. I mean, you were reading all the news articles about this case?

"[Grasso:] I was. Yes, I was. I was traumatized.

"[Defense Counsel:] Sure. . . . But you—you claim she made this comment is what you claim. But you also admit that you don't know what her exact words were; isn't it true?

"[Grasso:] She made a comment saying 'I would be in my garage right now if they did not disable my vehicle.' "

Defense counsel asked Grasso if it was true that she waited three years to come forward "about some comment you think you heard; right?" After Grasso answered "yes," defense counsel persisted, "And that's why you came in here, for that comment; right?" Defense counsel then accused Grasso of suggesting that Grossman did not care about the children she had killed. He ceased questioning Grasso soon thereafter.

The prosecutor requested a sidebar conference. Outside the presence of the jury, the prosecutor stated the defense had

attempted to imply bias by eliciting Grasso's testimony that she delayed reporting Grossman's statement for three years. The prosecutor requested that she be permitted to ask Grasso why she delayed. The court inquired as to what the prosecutor anticipated Grasso would testify. The prosecutor stated that she expected Grasso to say she was concerned that telling the authorities what Grossman said to her would violate medical privacy laws. She also anticipated Grasso would testify that the events were difficult to talk about. The prosecutor noted that the defense had already elicited that Grasso went to therapy.

The trial court ruled that because defense counsel elicited the testimony that Grasso had waited for three years to report Grossman's comments, the prosecution was entitled to ask Grasso why she waited three years. The court stated, "I don't have a problem with therapy. If therapy is the reason why she waited three years, then she can state that. What I don't want her getting into is the opinions and speculation about the defendant."

On rebuttal, Grasso confirmed that she hesitated to reach out to authorities because of her concerns about privacy laws, and that she ultimately sought permission from her supervisor. Grasso briefly testified that she was "very traumatized" by the incident, went to therapy for nine months, and "still can't talk about that night without crying."

b.    *Analysis*

Grossman concludes that her comment that she would be in her garage if OnStar had not disabled her vehicle had little probative value and a high risk of prejudice, but she provides no

83

support for her conclusion.[15]  The closest thing to reasoning in the opening brief is Grossman's statement that the probative value of her statement to Grasso was somehow lessened because Grossman "pulled over even though her vehicle was drivable and did not attempt to flee."  Grossman again confuses the probative value of evidence with its weight.  Weight is for the jury to decide and does not lessen the relevance of evidence.

Additionally, Grossman's assertion that her car was drivable is not supported by a citation to the record.  Presumably, Grossman is relying on the testimony of Officer Garrett Smith who inspected her vehicle three months after the collision.  In the facts section of the opening brief—56 pages earlier—based on Officer Smith's testimony, Grossman concludes that her Mercedes was drivable after it was disabled.  The officer testified that when he inspected the car the battery was dead, but that he was able to jump start and drive it.  This is not evidence that the car was operable after Grossman pulled over on the night of the collision.  Grossman's assertion is pure speculation.  The

---

[15] The following is the entirety of Grossman's contention as set forth in the opening brief:

"b. Grasso's testimony was more prejudicial than probative.

There were several problems with Grasso's testimony.  The statement's relevance was minimal (especially given the fact that appellant pulled over even though her vehicle was drivable and did not attempt to flee), but the danger of prejudice was extremely high.  Another issue with the statement was that Grasso had not come forward for three years.  Further complicating the matter, after Grasso testified that she did not come forward for three years, the trial court permitted her to testify, over appellant's objection, that she was traumatized by the event and went to therapy for nine months. This testimony should not have survived an Evidence Code section 352 analysis."

prosecution presented evidence that Grossman told Deputy Mejia that Mercedes had disabled her vehicle. That evidence demonstrates that either the car was not drivable, or, if Grossman was incorrect and the car was drivable, that Grossman was not aware that the Mercedes was drivable and did not know that she could flee the scene in her car. The rest of the argument in the opening brief consists of a recitation of the proceedings at trial and facts elicited in testimony. Grossman does not explain how she was unduly prejudiced.

The evidence that Grossman told Grasso she would be at home in her garage if her car had not been disabled suggests that Grossman did not intend to remain at the scene of the crash or intend to render aid to the people that she had hit. It is highly relevant to the hit and run charge and the enhancements. The trial court did not abuse its discretion by admitting the evidence of Grossman's statement to Grasso.

## E. *Engaging in a Speed Contest*

Grossman contends that the prosecution violated her constitutional right to due process by presenting a theory of liability in her case that conflicted with its theory in former codefendant Scott Erickson's prosecution. This contention also lacks merit.

### 1. Proceedings

Prior to trial, Grossman filed a motion in limine to prevent the prosecution from presenting inconsistent theories in Grossman's and Erickson's prosecutions. At a hearing on the

85

matter, the prosecutor explained that the People had different evidence in the two cases. The People had the "black box" from Grossman's vehicle, but not from Erickson's. Additionally, Grossman's car was behind Erickson's, so it was clear that she could see him and was racing him, but there was no proof that he could see Grossman and was racing her. There were also additional witnesses who came forward and stated that the cars appeared to be racing only after charges were dropped in Erickson's case.

The defense contended that the prosecutor's position in the two cases was inconsistent—in Grossman's case the prosecutor claimed Grossman was engaging in a speed contest and in Erickson's case the same prosecutor stated that Erickson had not participated in a speed contest. Defense counsel argued that racing requires more than one person.

The trial court stated that even if Erickson had been racing, he would not be liable for murder. The People had never changed their position that Grossman committed the murders. Whether the two cars were racing was subject to interpretation.

The court distinguished *In re Sakarias* (2005) 35 Cal.4th 140, 146 (*Sakarias*), on which Grossman had relied. In *Sakarias*, the prosecutor acted in bad faith and intentionally manipulated evidence. There was no evidence of bad faith or manipulation of evidence in the present case. Here, the different evidence in Grossman and Erickson's cases justified the variation in theories. The court ruled that the People could make any arguments that were consistent with the evidence, including racing if there was a basis for it. The court found that the theories in Grossman and Erickson's case were not inconsistent—the theory had always

been that Grossman perpetrated the murders. *Sakarias* was not analogous.

## 2.    Legal Principles

In *Sakarias*, *supra*, 35 Cal.4th at page 146, defendants Sakarias and Waidla "bludgeoned [the victim] with the blunt end of the hatchet, stabbed her with [a] knife, and chopped at her with [a] hatchet blade. Overall, the medical examiner found five blunt force impacts to [the victim's] head . . . four stab wounds to her chest . . . and three chopping wounds to her upper head. One of this last group of injuries, inflicted before death, was struck with 'tremendous' force, penetrating [the victim's] skull completely. The other two chopping wounds were inflicted with somewhat less force, after or around the time of death." Other evidence strongly suggested that Waidla struck the hatchet blow that preceded the victim's death and Sakarias inflicted the two post-mortem hatchet blows. (*Id*. at p. 147.)

The defendants were tried separately. (*Sakarias*, *supra*, 35 Cal.4th at p. 160.) The acts each defendant committed were sufficient to establish their respective guilt for murder, but only one of the defendants could have inflicted the first antemortem hatchet blow that was the basis for establishing a special circumstance carrying a death sentence. (*Ibid*.) In both trials, the prosecutor argued that the defendant had inflicted all three hatchet wounds. (*Ibid*.) Both defendants were sentenced to death. (*Id*. at p. 144.)

In consolidated petitions for habeas corpus, the Supreme Court held that "fundamental fairness does not permit the People, without a good faith justification, to attribute to two

87

defendants, in separate trials, a criminal act only one defendant could have committed. By doing so, the state necessarily urges conviction or an increase in culpability in one of the cases on a false factual basis, a result inconsistent with the goal of the criminal trial as a search for truth." (*Sakarias*, *supra*, 35 Cal.4th at pp. 155–156.)

### 3. <u>Analysis</u>

In the opening brief, Grossman argues that the prosecution violated her due process rights by arguing that Grossman and Erikson engaged in a speed contest, because in Erikson's case the prosecutor had stated he did not believe there was sufficient evidence of racing to support the theory. Although Grossman lumps her due process argument in with her arguments relating to admission of evidence, it is not an exclusion of evidence argument; it is an argument that the prosecution should have been precluded from arguing inconsistent theories of guilt. The Rules of Court require that the appellant present each substantive argument in a separate section with an appropriate heading. Grossman's failure to do so waives her argument. (*Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345; Cal. Rules of Court, rule 8.204(a)(1)(B) [briefs must "[s]tate each point under a separate heading or subheading summarizing the point"].)

Additionally, the opening brief does not adequately set forth the legal principles that govern this issue. Grossman cites *Sakarias*, *supra*, 35 Cal.4th 140, a prosecutorial misconduct case, to assert that, absent a good faith justification, due process prohibits the People from prosecuting a case under a theory that

is inconsistent with its theory in the prosecution of a separately-tried codefendant.  Grossman states, without explanation, that the theories in her and Erickson's cases contradicted one another.  She does not discuss *Sakarias* or explain why it should apply here.  These deficiencies are ample basis for this court to disregard her argument altogether.  (*Meridian Financial Services, Inc. v. Phan*, *supra*, 67 Cal.App.5th at p. 684 [review limited to issues adequately raised and briefed]; see also Cal. Rules of Court, rule 8.204(a)(1)(B) [briefs must "support each point by argument and, if possible, by citation of authority"].)  Regardless, Grossman's claim fails on the merits.

Unlike *Sakarias*, here the prosecutor did not manipulate the evidence to ensure that two defendants were found guilty based on an act that could only have been committed by one person.  Only Grossman was charged with and convicted of murder.  The theories in the two cases were not inconsistent.  The prosecutor never stated that the evidence showed Erickson was *not* racing; he stated that there was not sufficient evidence to prove Erickson was racing.  This was because Erickson's case lacked evidence present in Grossman's case.  The prosecution had the EDR or "black box" for Grossman's vehicle, and eyewitnesses stated that Erickson's car was in the lead.  Because Grossman was behind Erickson, she had to have known how closely she was following him.  The EDR download showed that Grossman was speeding excessively and flooring her car's accelerator.  There was no evidence that Erickson looked back and observed Grossman's vehicle's position, and there was no EDR evidence of Erickson's speed or acceleration.  After charges were dropped in Erickson's case, additional witnesses who described the cars' movements as racing came forward.  As the trial court observed,

89

the prosecution never wavered in its theory that Grossman, and not Erickson, perpetrated the murders. Grossman's due process rights were not violated.

## F. *Custodial Interrogation*

Grossman contends that the trial court erred by refusing to suppress statements that she made to Deputy Kelley prior to being advised of her *Miranda* rights during a custodial interrogation. This contention also fails, as we conclude that Grossman was not in custody at the time that she made the contested statements.

### 1. <u>Legal Principles</u>

Before any custodial interrogation, suspects must be told they have a right to remain silent, anything they say may be used as evidence against them in court, and they are entitled to the presence of an attorney, either retained or appointed, at the interrogation. (*Miranda*, *supra*, 384 U.S. at p. 444; *Thompson v. Keohane* (1995) 516 U.S. 99, 107.) "An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.] Whether a person is in custody is an objective test; the pertinent inquiry is whether there was ' " 'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " ' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.)

The California Supreme Court has held that "the term 'custody' generally does not include 'a temporary detention for investigation' where an officer detains a person to ask a moderate

90

number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." (*People v. Farnam* (2002) 28 Cal.4th 107, 180; see also *Berkemer v. McCarty* (1984) 468 U.S. 420, 442 [temporary questioning of a detained driver suspected of being intoxicated is not necessarily custodial where the officer asks "a modest number of questions" and requests him to perform "a simple balancing test at a location visible to passing motorists"].) "General on-the-scene questioning may take place of persons temporarily detained by officers who do not have probable cause to arrest. Questioning under these circumstances is designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and thus enable the police to quickly ascertain whether such person should be permitted to go about his business or held to answer charges." (*People v. Milham* (1984) 159 Cal.App.3d 487, 500.)

"All objective circumstances of the interrogation are relevant to this inquiry, including the site of the interrogation, the length and form of questioning, and whether the officers have conveyed to the subject that their investigation has focused on him or her." (*People v. Caro* (2019) 7 Cal.5th 463, 491–492.) Factors additionally relevant to this determination include the ratio of police officers to suspects, whether the suspect was told he or she could terminate the questioning, the demeanor of the officers and whether they dominated or controlled the interrogation or were aggressive, confrontational, or accusatory, whether the officers pressured the suspect, whether the suspect was arrested at the end of the interrogation, and whether the suspect's freedom of movement was restricted during the

interrogation. (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 35–36.)

However, even in instances where one's freedom of movement is curtailed, the question becomes " 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.' " (*People v. Caro*, *supra*, 7 Cal.5th at p. 491.) The determination of whether a defendant is in custody at the time of questioning is objective and therefore "does not depend on 'the subjective views harbored by either the interrogating officers or the person being questioned.' " (*Id.* at p. 492.)

To determine whether a trial court admitted a statement in violation of *Miranda*, we independently review the application of law to facts. (*People v. Weaver* (2001) 26 Cal.4th 876, 918.) We generally accept the "trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." (*People v. Cunningham* (2001) 25 Cal.4th 926, 992.) However, where "an interview is recorded, the facts surrounding the admission or confession are undisputed and [courts] may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

### 2. <u>Evidence and Proceedings</u>

#### a. *Evidence*

At the preliminary hearing, Deputy Mejia testified that he responded to the collision at about 7:10 p.m. Other deputies directed Deputy Mejia to continue driving west because the suspect had left the scene traveling in that direction.

Deputy Mejia encountered Grossman three-tenths of a mile down the road. No other deputies were present. Grossman had pulled over and stopped her white Mercedes SUV in the bicycle lane. She was standing outside the vehicle, inspecting it. The Mercedes' hazard lights were flashing. The Mercedes had front end damage and the air bags had deployed.

Deputy Mejia asked Grossman if she would sit in his patrol car because it was dark and it would be safer for her to do so. She agreed and voluntarily went to sit in the back seat of the vehicle. Deputy Mejia testified that Grossman was not free to leave the scene at the time that she elected to get into the patrol car because Deputy Mejia "had not determined at that time what had occurred at the traffic collision because it was still so fresh." There is no evidence that he relayed this information to Grossman, however.

Grossman told Deputy Mejia that she pulled over because her car had been disabled by Mercedes. Grossman also said she had hit something, but that she did not know what she had hit. Deputy Mejia did not ask Grossman any further questions. The deputy noticed the smell of alcohol on Grossman's breath and person, and observed that her eyes were bloodshot and watery. He contacted dispatch and requested to have a qualified deputy come to perform a DUI investigation.

Grossman asked Deputy Mejia what happened in the collision involving her vehicle. The deputy did not give Grossman any information regarding the accident or tell her that children were involved. Deputy Mejia did not ask for Grossman's identification, "run her address," ask why her airbags deployed, or "anything." Grossman waited in the back of the patrol car for

the deputy who would perform the DUI investigation to arrive. She was in the vehicle for a maximum of 45 minutes.

At the preliminary hearing, Deputy Kelley testified that he responded to conduct the DUI investigation. When he arrived at about 8:15 p.m., Grossman was in the rear passenger seat of Deputy Mejia's patrol car. Deputy Kelley opened Grossman's door and noticed a faint smell of alcohol. Deputy Kelley had Grossman exit the patrol car. He began questioning her using a pre-investigative questionnaire. Deputy Mejia left to assist in the investigation at the accident site.

Deputy Kelley asked Grossman for general identifying information and information about any health conditions she had. After a few questions, Grossman asked the deputy, "Can you please tell me what's going on here?" Deputy Kelley responded, "I'm doing an investigation real quick here." Grossman said she had been told about an accident involving children. Deputy Kelley did not respond to Grossman's statement. He continued asking questions from the pre-investigative questionnaire, asking Grossman if the airbag had hit her head. The deputy did not mention that an accident involving children had occurred nearby. Deputy Kelley asked Grossman if she had anything alcoholic to drink, the quantity of alcohol that she had consumed, how long ago she had finished drinking, and other basic, related questions. Grossman responded that she drank one margarita around 5:00 p.m. and finished her drink by approximately 5:30 p.m. At one point, Deputy Kelley asked Grossman what city they were in, explaining: "Just [a] question[] I gotta ask you." Grossman said she understood. The questioning lasted approximately seven minutes before Deputy Kelley administered an FST test.

94

After concluding the FST, Deputy Kelley asked Grossman if she would consent to a PAS test to assist him in determining whether she was under the influence of alcohol. Deputy Kelley advised Grossman that she could refuse to take the PAS test, but if she was arrested she would be required to give a sample of her blood or breath for purposes of determining her blood alcohol content. Grossman consented to take the PAS test.

After Deputy Kelley finished administering the PAS test, he directed his partner to handcuff Grossman. The deputy handcuffed Grossman, escorted her to a police vehicle, and placed her under arrest. The deputy informed Grossman that she was being arrested for driving under the influence and causing a fatal traffic collision.

   b. *Motion to Exclude Grossman's Statements to Deputy Kelley*

Prior to trial, Grossman filed a motion in limine, objecting to the admission of statements she made before she was informed of her *Miranda* rights. The motion expressly limited her objections as follows: "Defendant hereby objects to the admission in this trial of any and all evidence related to admissions of the Defendant made prior to being advised of her *Miranda* rights after she was detained. Objection is made to the introduction of any statements made prior to the field sobriety tests being administered. The questions asked are per a pre-printed form making many detailed (not general) inquiries amounting to at least 23 questions relating to drinking, eating, sleeping, etc." Grossman argued that these questions amounted to an interrogation and that she was in custody when interrogated.

Grossman asserted that the number and detail of the questions asked distinguished them from permissible investigatory questions.

The People filed a response noting that the statements Grossman objected to appeared to be limited to those made to Deputy Kelley prior to his administration of the FST and did not include any statements Grossman made to Deputy Mejia. The People argued that these " 'general on-the-scene' questions 'present in the facts' " were separate from any detention or interrogation and did not violate *Miranda*. Additionally, under established law the deputies were not required to give a *Miranda* advisement before preliminary questioning of persons suspected of driving under the influence. (*Berkemer v. McCarty, supra*, 468 U.S. at pp. 435–442; *People v. Carter* (1980) 108 Cal.App.3d 127, 130–131.) Moreover, neither an FST test nor a person's refusal to perform an FST test is subject to *Miranda*. Grossman was not in custody and was not interrogated. Her statements were admissible.

In her reply, Grossman objected generally to evidence "pertaining to defendant's sobriety, consisting of the driving under the influence investigation in this case, including field sobriety testing, chemical tests and other evidence." Her arguments primarily focused on her contention that the evidence was not relevant to a prosecution that did not include alcohol-related charges and was unduly prejudicial pursuant to Evidence Code section 352. Grossman did not make specific arguments relating to the admission of her statements pursuant to *Miranda*.

At the hearing on the motion in limine, the court asked defense counsel if Grossman was challenging the statements she made *during* the FST test. Defense counsel informed the court

96

that Grossman only objected to statements made *prior to* administration of the FST. Counsel broke these down into two categories: "[t]he initial on-scene questions and responses and then the pre-standard field sobriety tests battery of investigative questions asked by the deputy on [the] scene [by] the name of Kelley."

Defense counsel argued that Grossman was in custody while she waited in Deputy Mejia's patrol car. The trial court disagreed, stating that in many cases defendants had been placed in patrol cars and brought out before questioning and/or FST tests and courts had held there was no *Miranda* violation.

The court stated that this was not a traffic stop. Grossman was outside of her car, standing on a public road when Deputy Mejia encountered her. Grossman told Deputy Mejia that Mercedes had disabled her car and that she had hit something, but she did not know what she had hit. The deputy was trying to ascertain what happened. He asked Grossman to move to his car for safety, and Grossman agreed. Deputy Mejia did not handcuff Grossman. The deputy was not confrontational or accusatory. There was no custodial interrogation, just investigatory questioning. No *Miranda* violation had occurred.

The court stated that, with respect to statements made to Deputy Mejia, Grossman was asked to wait in the patrol car and she agreed to do so, she was not handcuffed, and she did not have to wait for an excessive amount of time. Only Deputy Kelley questioned Grossman. The deputy asked her standard questions that were necessary to the FST test. Asking Grossman to perform the FST test was lawful. The FST test was not interrogation. The court ruled it would admit any statements Grossman made during the FST test.

### 3. <u>Analysis</u>

#### a. *Forfeiture*

On appeal, Grossman contends that the trial court's admission of *all* statements she made to Deputy Kelley—both before and during his administration of the FST test—violated *Miranda.*[16] As is plain from the foregoing, Grossman not only failed to challenge admission of the statements she made to Deputy Kelley during the FST test, counsel expressly disavowed any challenge statements made during the FST test when the trial court expressly asked if Grossman contested admission of those statements. In a footnote in the opening brief, Grossman asserts, without explanation or citation to authority that "[appellant's] motion to suppress statements made to Deputy Kelley is reasonably construed to include a challenge to appellant's statements during the [FST] test." We disagree. Grossman did not challenge or even mention any statements she made during the FST in her briefing in the trial court or at the hearing on the motion. She did not object when the trial court ruled that Deputy Kelley's questions during the FST's were lawful and that the statements she made during the FST were admissible. Grossman has forfeited her objections to the admission of statements she made to Deputy Kelley during the FST test. (*People v. Viray*, *supra*, 134 Cal.App.4th at p. 1208 [defendant must make a timely and specific objection to preserve an issue for appellate review].)

---

[16] Grossman does not challenge admission of any statements she made to Deputy Mejia.

98

b.      *Grossman's Miranda Rights Were Not Violated*

We conclude that Grossman was not in custody for *Miranda* purposes. Deputy Mejia made contact with Grossman in a public area. The deputy did not initiate a traffic stop or direct Grossman to exit her vehicle. Grossman was standing on the side of the road looking at her car when the deputy arrived. Deputy Mejia had reason to suspect that Grossman was the driver of the car involved in a hit and run collision that had occurred three-tenths of a mile up the road: Grossman had pulled into the bicycle lane and her car's hazard lights were flashing. Her vehicle had sustained front-end damage and the air bags had deployed.

Deputy Mejia did not impinge Grossman's freedom of movement. He asked Grossman if she would sit in his patrol car for her safety, as it was getting dark. Grossman agreed and got into the vehicle voluntarily. She was not handcuffed. There is no evidence that Deputy Mejia advised Grossman that she was not free to leave.

Before she entered the patrol car, Grossman told the deputy she hit something and that Mercedes had disabled her car. Deputy Mejia did not ask Grossman any follow-up questions. Deputy Mejia did not convey to Grossman his suspicion that she was the driver in the collision involving fatalities. When Grossman asked Deputy Mejia what happened, he did not provide any information. Deputy Mejia gave Grossman no reason to believe that she was under investigation or that she might be arrested.

Grossman was detained for a reasonable period of time under the circumstances. Deputy Mejia quickly determined that

99

a DUI investigation was necessary from the smell of alcohol on Grossman's person and breath, and the watery, bloodshot appearance of her eyes.  He immediately sought assistance from Deputy Kelley to conduct the DUI investigation.  Deputy Kelley drove to the scene in less than 45 minutes.  Once he arrived, Deputy Kelley completed the pre-FST questioning of Grossman in under seven minutes.  A detention of less than an hour was not excessive in light of the duties that the deputies needed to perform to determine what had occurred.  (See *People v. Tully* (2012) 54 Cal.4th 952, 980 [officer may temporarily detain a suspect for the time necessary for the officer to discharge his or her duties]; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1753–1754 ["rationally explainable" detention of more than one hour is not "custody" for *Miranda* purposes].)

Deputy Kelley questioned Grossman outside of the patrol car in public view.  Although other deputies were present, Deputy Kelley was the only person who questioned Grossman.  Deputy Kelley did not handcuff Grossman or otherwise restrain her movement, and he did not advise her that she was required to answer his questions.

Deputy Kelley asked Grossman questions from a standard questionnaire used for DUI investigations.  " 'When circumstances demand immediate investigation by the police, the most useful, most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation . . . and enable the police to quickly determine whether they should allow the suspect to go about [her] business or hold [her] to answer charges.' " (*People v. Davidson* (2013) 221 Cal.App.4th 966, 968.)  Deputy Kelley's questions were basic and designed to determine whether a driver was operating a vehicle

under the influence.  He asked about factors that could impair a driver who was not intoxicated—including health conditions, prescription medication, and sight impairment.  He also asked alcohol-related questions, including whether Grossman had anything to drink, when she drank, and the quantity.  These are all facts that assist officers in determining whether a person may have been driving under the influence.  When Grossman told Deputy Kelley she had heard there was an accident involving children, the deputy re-directed her attention to the standard questions.  Deputy Kelley never talked to Grossman about the collision involving children and, in fact, steered her away from making statements unrelated to the standard FST test questions.

Deputy Kelley did not indicate that police suspected Grossman caused the fatal collision.  His manner was friendly and non-threatening.  The deputy explained to Grossman that he just needed to do an investigation "real quick" and that there were standard questions "I gotta ask."  Grossman told him she understood.  The deputy did not dominate the investigation.  He asked Grossman questions and acknowledged her answers.  When Grossman expressed a desire to call her husband, the deputy politely reminded her that they needed to conclude the investigation first.

Finally, Grossman was not placed under arrest immediately after answering the questions on the DUI questionnaire.  Deputy Kelley conducted the FST test.  He then asked Grossman if she would submit to a PAS test to assist him in determining if she was under the influence of alcohol.  Deputy Kelley advised Grossman that she was not required to take the PAS test, but that if she was arrested she would be required to take a breath or blood test.  Grossman was not arrested until

after she completed two PAS tests that indicated she had alcohol in her bloodstream. Under the circumstances, we cannot conclude that Deputy Kelley's questioning of Grossman was custodial or that Grossman's *Miranda* rights were violated by the trial court's admission of Grossman's statements.

## G. *Motion to Traverse Search Warrant*

Grossman contends that she was entitled to an evidentiary hearing pursuant to *Franks*, *supra*, 438 U.S. 154, because she made a substantial showing that (1) the warrant to obtain her blood sample contained deliberately false statements and omitted favorable facts; and (2) if the true facts had been fully presented there would not have been sufficient probable cause for a magistrate to grant the warrant. We disagree.

### 1. Legal Principles

Under *Franks*, *supra*, 438 U.S. 154, "[a] defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. The trial court must conduct an evidentiary hearing [(*Franks* hearing)] only if a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. Innocent or negligent misrepresentations will not support a motion to traverse. ([*Id.*, at pp.] 154–156; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 988–989.) A defendant

102

who challenges a search warrant based on *omissions* in the affidavit bears the burden of showing an intentional or reckless omission of material information that, when added to the affidavit, renders it insufficient to support a finding of probable cause. (See *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1581–1582; *People v. Sousa* (1993) 18 Cal.App.4th 549, 562–563.) In either setting, the defendant must make his showing by a preponderance of the evidence, and the affidavit is presumed valid." (*People v. Scott* (2011) 52 Cal.4th 452, 484.) "Because of the difficulty of meeting the 'substantial preliminary showing' standard, *Franks* hearings are rarely held." (*People v. Estrada* (2003) 105 Cal.App.4th 783, 790.) We review the denial of a request for a *Franks* hearing de novo. (*People v. Sandoval* (2015) 62 Cal.4th 394, 410.)

Vehicle Code section 23612, subdivision (a)(1)(A), the implied consent statute, provides that: "[a] person who drives a motor vehicle is deemed to have given his or her consent to chemical testing of his or her blood or breath for the purpose of determining the alcoholic content of his or her blood, if lawfully arrested for an offense allegedly committed in violation of Section 23140, 23152, or 23153." "The testing shall be incidental to a lawful arrest and administered at the direction of a peace officer having reasonable cause to believe the person was driving a motor vehicle in violation of [one of the foregoing Vehicle Code sections]." (*Id.*, subd. (a)(1)(C).) Failure to submit to chemical testing following arrest subjects the arrestee to various penalties ranging from administrative revocation or suspension of the person's driver's license to fines and mandatory imprisonment if the person is convicted. (*Id.*, subd. (a)(1)(D).) Persons arrested must be advised of these consequences. (*Ibid.*) With certain

103

exceptions, a driver lawfully arrested for one of the listed violations has the choice of which form of chemical testing they wish to consent to—blood or breath. (*Id.*, subd. (a)(2).) An officer "shall advise the person that he or she has that choice." (*Id.*, subd. (a)(2)(A).)

"A [PAS] test that indicates the presence or concentration of alcohol based on a breath sample in order to establish reasonable cause to believe the person was driving a vehicle in violation of Section 23140, 23152, or 23153 is a field sobriety test and may be used by an officer as a further investigative tool." (Veh. Code, § 23612, subd. (h).) "If the officer decides to use a [PAS] test, the officer shall advise the person that he or she is requesting that person to take a [PAS] test to assist the officer in determining if that person is under the influence of alcohol or drugs, or a combination of alcohol and drugs. The person's obligation to submit to a blood, breath, or urine test, as required by this section, for the purpose of determining the alcohol or drug content of that person's blood, is not satisfied by the person submitting to a [PAS] test. The officer shall advise the person of that fact and of the person's right to refuse to take the [PAS] test." (*Id.*, subd. (i).)

## 2. Facts and Proceedings

### a. *Warrant for Blood Sample*

On the night of the collision, Deputy Davis Huelsen sought a warrant to extract a blood sample from Grossman. The deputy attested that, 15 minutes after a fatal collision in which two people were killed, Deputy Mejia encountered Grossman

104

approximately a quarter of a mile away, standing outside of her vehicle. Deputy Huelsen checked a box indicating that Grossman was believed to be the driver of the vehicle because there was a seatbelt mark across Grossman's chest and/or injuries present. Deputy Mejia and Deputy Kelley observed that Grossman smelled of alcohol; Grossman admitted to having consumed a Margarita. Deputy Huelsen attested that Grossman's blood alcohol content measured 0.075 on a PAS test, but did not check the box indicating that this symptom was observed. Deputy Huelsen also checked a box indicating that after Deputy Kelley administered the chemical test admonition per CVC 23612-Implied Consent, Grossman refused to submit to a breath or blood test. Based on his 25 years of training and experience in investigating impaired driving and collisions, Deputy Huelsen opined that Grossman was operating a motor vehicle under the influence of alcohol and/or drugs and that unless a blood sample was obtained promptly, dissipation of blood alcohol and/or drug content would occur.

The warrant was executed and Grossman submitted to a blood test. An analysis of Grossman's blood showed that she had a blood alcohol content of 0.080 percent approximately three and a half hours after the collision. Grossman's blood also contained an unquantified amount of Valium and a Valium metabolite.

> b. *Motion, Opposition, and Reply*

> i. <u>Motion</u>

Prior to trial, Grossman moved to quash the warrant and suppress the blood sample evidence based on alleged false

105

statements and material omissions of fact in the warrant. Grossman asserted that Deputy Huelsen knowingly and intentionally made material false statements and omissions in the warrant. She requested that the court hold a hearing pursuant to *Franks*, *supra*, 438 U.S. 154. Grossman contended Deputy Huelsen's statement that she refused to take a blood or breath test was false. She asserted that she was never asked whether she would submit to a post-arrest breath test and that she did not refuse to take a post-arrest breath test. Grossman further complained that although Deputy Kelley's report reflected that her coordination was "fair," she was "cooperative," and the odor of alcohol on her person was "weak," these favorable facts were omitted from the warrant. Grossman argued that even absent the false statement, the warrant lacked probable cause because it did not indicate that she displayed all of the common symptoms of driving under the influence. Additionally, the box next to Deputy Huelsen's statement that "[Blood alcohol content] measured .075% on a [PAS] test" was not checked, "so one is left to speculate as to what it means."

ii.    Opposition

The People opposed the motion on the basis that Grossman's blood was drawn pursuant to a lawful warrant. Grossman could not meet the standard for a *Franks* hearing to traverse the warrant because she could not show that Deputy Huelsen knowingly, intentionally, and with reckless disregard for the truth made false statements and omitted material facts or that the false/omitted facts were necessary to the finding of probable cause.

106

### iii.    <u>Reply</u>

Grossman filed a reply arguing that the PAS tests she took qualified as chemical testing pursuant to Vehicle Code section 23612, subdivision (a)(1)(A), and that requiring her to take a post-arrest blood test was unreasonable in light of the fact that she had already provided pre-arrest breath tests.  Grossman also argued that the prosecutor wrongly stated that to obtain a *Franks* hearing she had to show that any falsehoods in the warrant were intentional.  Grossman asserted that she was only required to show the affiant made false statements with reckless disregard for the truth.  The fact that the affidavit stated Grossman refused a blood or breath test although she was not asked to submit to a post-arrest breath test was material, because refusal to take a chemical test is an indicator of consciousness of guilt and weighs heavily in favor of issuance of a warrant.

### c.    *Trial Court's Ruling*

At a hearing on the matter, the parties argued their positions.   The trial court found that Deputy Kelley properly advised Grossman of the implied consent law, and if anything in the warrant was incorrect, it was that "technically she didn't refuse to take a blood or breath test.  She just refused to take a blood test."  Although authorities obtained PAS test results that agreed within 0.02 percent and were therefore admissible at trial, that did not obviate the need for a blood sample or make issuance of a warrant unreasonable.

The trial court agreed with the defense that the warrant was "sloppy," but found that even if Deputy Huelsen acted negligently, he did not act recklessly. The affidavit did not convey that Grossman refused to take the PAS test. A magistrate would understand that Grossman's blood alcohol content was 0.075 percent and know that fact was case-specific. At most, the affidavit conveyed that Grossman submitted to a PAS test but did not consent to a post-arrest breath test after being advised under the implied consent law.

The court ruled that there was insufficient evidence to support holding a *Franks* hearing. Even assuming the defense met the burden of showing recklessness, the misstatement and omissions were not material. A magistrate would consider and give weight to the fact that Grossman refused a blood test even if she was not asked to submit to a breath test. Even absent that fact, the remaining information—that there was a collision about a quarter of a mile away with two fatalities, Grossman was found outside her vehicle, she smelled of alcohol, she admitted to drinking, she had a blood alcohol content of 0.075 percent, and a deputy with 25 years of experience believed she was driving under the influence—constituted probable cause to obtain a blood sample. The omissions did not contribute significantly to issuance of the warrant. The court denied the motion to traverse and request for a *Franks* hearing.

3. **Analysis**

Grossman contends that the trial court erred by denying her request for a *Franks* hearing. She claims that the affidavit in support of the search warrant falsely states that (1) she was

108

"given the choice" to take a post-arrest breath test, and (2) she refused to take a breath test.

The first part of Grossman's claim is a mischaracterization of the affidavit, which Grossman compounds with a misstatement of the law. The affidavit contains a checked box indicating that "After being read verbatim the Chemical Test Admonition per CV 23612-Implied Consent, suspect . . . refused to submit to breath *or* blood test." (Italics added.) As pertinent here, the Chemical Test Admonition that Deputy Kelley read to Grossman states, "You are required by state law to submit to and complete a chemical test to determine the alcohol and/or drug content of your blood. Because I believe you are under the influence of alcohol or a combination of alcohol and drugs, you have a choice of taking a breath or blood test." As defense counsel acknowledged at the hearing in the trial court, Deputy Kelley properly advised Grossman under the Chemical Test Admonition that she had a choice of whether to take a breath test or a blood test. The affidavit accurately states that she was so advised. Grossman conflates being asked if she wanted to take a specific test *after being advised of her options* with being advised that she had a choice of tests. The two are not the same. Officers only have a legal duty to advise suspects of their choice. (Veh. Code, § 23612, subd. (a)(2).)

Grossman's second claim—that the affidavit inaccurately states she refused a breath test—has some merit. Although read literally, "refused to submit to breath *or* blood test" indicates that Grossman refused one or more of the tests without specifying which test(s) she refused, in the context of the law the phrase is ambiguous and could be interpreted to mean that Grossman expressly refused both chemical tests. (Italics added.) Grossman

109

argued for the latter interpretation at the hearing, but defense counsel did not elicit any evidence regarding how Deputy Kelley or Deputy Huelsen interpreted the statement in the affidavit. In the absence of any evidence of the deputies' understanding of the phrase it is impossible to attribute deliberate falsity or recklessness to either of the deputies. Moreover, even if Deputy Huelsen had intentionally or recklessly supplied false information, the corrected affidavit would contain sufficient facts to support probable cause to issue a warrant, as we discuss below.

Grossman also asserts that the affidavit omits that she was cooperative, that the odor of alcohol emanating from her person was "weak," and that her coordination was "fair," as included in Deputy Kelley's DUI Complaint Report. Given that Deputy Huelsen filled out a standard form that did not include space for this level of detail, we cannot say that the omissions were deliberate or made with reckless disregard for the truth.

Regardless, if the affidavit was amended to exclude any implication that Grossman refused to take a post-arrest breath test and to include all of the details known to the deputies, it would include the following: Deputy Mejia discovered Grossman about three-tenths of a mile from the site of a hit and run collision that resulted in the death of two pedestrians. Grossman had pulled over to the side of the road and was looking at the damage to her car. She admitted to being the driver of the vehicle, admitted to hitting something, and told the deputy that Mercedes had disabled her car. Her eyes were watery and droopy and a weak smell of alcohol was emanating from her person. Grossman was generally cooperative and displayed "fair" coordination in the FST tests that Deputy Kelley administered

110

about an hour after the collision.  Grossman admitted to drinking a margarita.  Deputy Kelley asked Grossman if she would be willing to take a PAS breath test and advised her that submitting to the PAS test would not excuse her from the obligation to submit to a blood or breath test if she was arrested.  Grossman agreed to take the PAS breath test.  During the PAS test, Grossman did not provide sufficient breath for the automatic trap to operate properly, despite being told multiple times that she needed to blow harder to provide an adequate sample.  The deputy had to utilize a manual trap instead.  Grossman's two PAS test results showed that she had a blood alcohol content of 0.075 and 0.076 percent approximately one hour after the collision.  After Grossman's arrest, Deputy Kelley properly advised Grossman that she had a choice of submitting to a blood or breath test.  Deputy Kelley asked Grossman if she would provide a blood sample and Grossman refused.  The deputy informed Grossman that he would seek a warrant for a blood draw.  Grossman did not state that she would submit to a breath test and Deputy Kelley did not ask Grossman if she preferred to take a breath test.

The foregoing facts support a finding of probable cause.  It can be readily inferred that Grossman was the driver of the car that had hit and killed two pedestrians from Grossman's location, the condition of her car, and her admission that she had hit something, although she did not know what.  Grossman had consumed alcohol, her blood alcohol content was very close to the legal limit, and she was still exhibiting signs of impairment an hour after the collision.  A deputy with 25 years of experience stated that it was his opinion that she was driving under the influence of alcohol or drugs and that unless a blood sample was

obtained promptly, dissipation of blood alcohol and/or drug content would result in destruction of evidence. We reject Grossman's assertion that "had she not refused [a post-arrest breath test], she would have necessarily consented and no warrant would be needed." Regardless of whether Grossman would have been cooperative and submitted to a post-arrest breath test (a conclusion that the evidence does not compel), at best Grossman had difficulty providing a sufficient breath sample during the PAS test, and she refused to provide a blood sample. A warrant was reasonably necessary to preserve accurate evidence of her blood alcohol content.

## H.    *Motion to Suppress Blood Evidence*

Grossman contends that the Los Angeles County Sheriff's Department's deliberate and systematic policy of compelling blood tests following a fatality where the driver is suspected of driving under the influence violated her Fourth Amendment right to be free of unreasonable searches and seizures.

### 1.    <u>Proceedings</u>

#### a.    *Motion to Suppress, Opposition, and Reply*

Grossman moved to suppress the blood sample evidence. She contended that it was obtained in violation of her Fourth Amendment rights because she had already submitted to pre-arrest breath tests. Grossman further argued that Deputy Kelley violated California's implied consent statute by not offering her a choice of chemical tests. She asserted that suppression of the

blood sample was the appropriate remedy because the Sheriff's Department had a deliberate and systematic policy of compelling blood tests following a fatality where the driver is suspected of driving under the influence.

The People opposed the motion to suppress on the basis that the officers who obtained the blood sample relied on the warrant in good faith. The People argued that the cases Grossman cited in support of her argument that suppression was an appropriate remedy were distinguishable because they involved warrantless searches or instances in which authorities had already obtained a chemical breath test and the prosecution sought additional punishment. The People further argued that failure to advise a suspect in compliance with the implied consent statute does not run afoul of any constitutional constraint or mandate suppression of the evidence.

Grossman filed a reply arguing that the People failed to produce evidence to support their argument that the good faith exception to the exclusionary rule should apply.

b. *Hearing on Motion to Suppress and Trial Court's Ruling*

At a hearing on the matter, the defense called Deputy Kelley, who testified that he was assigned to Malibu traffic patrol at the time of the collision. He was contacted to report to Westlake Village to conduct a DUI investigation of Grossman. He administered two PAS tests to Grossman. The results were

113

0.076 and 0.075 percent, and agreed within 0.02 percent.[17]  The deputy administered the PAS breath tests at 8:32 p.m. and 8:35 p.m.  Using the Chemical Test Admonition on a DSM-367 form, Deputy Kelley admonished Grossman that she had a choice of taking a blood test or a breath test.  The deputy then asked Grossman if she would submit to a blood test, and she refused.  Deputy Kelley intentionally refrained from asking Grossman if she would take a breath test because the case involved a fatal collision, and it was practice to take a blood draw in cases involving a fatal collision.  After Grossman refused the blood test, Deputy Kelley advised Grossman that he would obtain a search warrant for a blood test.  Deputy Kelley did not write the warrant affidavit; Deputy Huelsen wrote the warrant based on the information that Deputy Kelley provided verbally.  Deputy Kelley did not tell Deputy Huelsen that he did not offer Grossman a breath test.

Deputy Kelley testified that when he conducted Grossman's PAS test, he first used an automatic trap.  After several unsuccessful attempts he switched to the manual trap.  The machine kept "erroring out" because Grossman was not blowing hard enough.  Deputy Kelley was not aware of any Sheriff's Department policy of only taking blood tests for collisions involving fatalities.  Deputy Kelley was unsure whether it was a Sheriff's Department practice to only take blood tests or if that was just his personal practice.  The deputy was not sure if he had ever had a case where a defendant refused to take a blood test but later stated that they were willing to take a breath test.

---

[17] The court took judicial notice that the device used for Grossman's PAS test was listed on the conforming products list for the National Highway Traffic Safety Administration.

Deputy Kelley testified that he did not offer a breath test because it was his practice and the practice of the Sheriff's Department to get a blood draw on all fatal collisions. Deputy Kelley testified that, as he understood the definitions, a policy is something that must be adhered to, whereas a practice is something that is "just do[ne]." He offered only blood tests because blood tests are more accurate and provide physical evidence, whereas breath tests dissipate.

Defense counsel acknowledged that if an officer simply bungles an admonition and fails to give a choice of test it is only a statutory violation and the remedy is not suppression of the blood evidence. However, counsel argued that under *In re Garinger* (1987) 188 Cal.App.3d 1149 (*Garinger*), if the failure to give the choice is deliberate and systematic, it may rise to the level of an equal protection violation. Here, Deputy Kelley testified that it was the practice of the Sheriff's Department to seek a blood test and not offer a breath test in accidents involving alcohol that result in fatalities. The Sheriff's Department's choice to ignore the law was a violation of equal protection and due process. The remedy should be suppression of the blood evidence.

The court accepted that it was Deputy Kelley's practice not to ask if a suspect wanted a breath test, and possibly the practice of deputies that he worked with, but not the formal policy of the entire department. The court also found that the issues Deputy Kelley encountered with the PAS test implicated the reasonableness of asking for blood only and for seeking a warrant. The officers needed an accurate sample and had probable cause for a warrant. Alternatively, the court found that the officers objectively acted in good faith and reasonably relied on the warrant. None of the exceptions to the good faith doctrine

applied. The court ruled that the blood test was not obtained in violation of the constitution. There was a significant difference between a blood sample taken by force and a blood sample taken with a warrant. That difference distinguished this case from the cases that the defense relied on. Here, Grossman was properly advised of her options. Violation of the implied consent statute was not equivalent to a constitutional violation. Even assuming that the Sheriff's Department had a policy of only asking a driver to take a blood test, that was not a violation of the statute or of constitutional rights. No case law indicated that suppression of the blood sample would be the appropriate remedy. There was no basis for suppression even if Grossman established a statutory violation because the deputy obtained a warrant. The court denied the motion for suppression.

### 2. <u>Analysis</u>

On appeal, Grossman contends that the blood sample evidence should have been suppressed because the Sheriff's Department failed to follow the law in DUI cases involving a fatality by deliberately and systematically not offering a breath test and always demanding a blood test.

"The Fourth Amendment protects the 'right of the people to be secure in their persons . . . against unreasonable searches' and provides that 'no warrants shall issue, but upon probable cause.' A blood draw is a search of the person. (*Birchfield v. North Dakota* (2016) 579 U.S. ——, 136 S.Ct. 2160.)" (*People v. Lopez* (2020) 46 Cal.App.5th 317, 323–324.) "In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by

116

substantial evidence.  (*People v. Weaver* (2001) 26 Cal.4th 876, 924.)  We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment.  (*Ibid*.)"  (*People v. Lenart* (2004) 32 Cal.4th 1107, 1119.)

Grossman relies on *Garinger, supra*, 188 Cal.App.3d 1149, to support her argument that the Sheriff's Department violated her equal protection rights by failing to advise her as Vehicle Code section 23612 requires, and that the blood sample evidence should therefore be suppressed.  In *Garinger*, the Court of Appeal issued an order to show cause based on the defendant's allegation that the Riverside Police Department had a "deliberate, systematic and persistent policy" of not giving advisements mandated by the implied consent statute—a claim that the District Attorney made no effort to deny.  (*Id*. at pp. 1152–1153.) The court appointed a referee to conduct an evidentiary hearing to determine the truth of the defendant's allegation.  (*Id*. at p. 1155.)  The referee's findings included that the police department had no deliberate, systematic, and persistent policy of failing to advise under the implied consent statute persons arrested on suspicion of drunk driving, and that the officer's failure to advise the defendant was therefore not the result of such a policy. (*Ibid*.)  The appellate court held that the officer's failure to give the statutorily-mandated advisements did not warrant suppressing blood alcohol evidence under the constitution.  (*Id*. at p. 1156.)

In this case, Deputy Kelley properly advised Grossman that she had a choice between a blood test and a breath test.  The deputy also advised Grossman that taking the PAS test did not relieve her of the obligation to take a chemical test.  Grossman

117

never expressed a desire to take a post-arrest breath test. Deputy Kelley did not violate the implied consent statute or Grossman's constitutional rights. Moreover, even if the deputy had been required to ask Grossman whether she wanted to take a breath test after fully advising her of her choice of tests, there is no evidence that his failure was the result of a "deliberate, systematic and persistent policy" of the Sheriff's Department. Deputy Kelley stated that he was not aware of any Sheriff's Department policy. It was his practice not to ask a person suspected of driving under the influence and causing a fatal collision whether they wanted to take a breath test. The deputy understood that other deputies in the Sheriff's Department also followed this practice, but, as the trial court found, the deputy was not in a position to speak for the entire Sheriff's Department and no other evidence of a Sheriff's Department policy was presented in the trial court. The contention lacks merit.

## I.    *Exclusion of Evidence*

Grossman contends that the trial court abused its discretion and violated her due process rights by excluding exculpatory evidence, including: (1) audio of an officer speaking as he recorded a surveillance video on his iPhone; (2) expert testimony on police practices; and (3) expert testimony regarding flawed road design that may have contributed to the collision. The trial court did not abuse its discretion.

118

## 1.    Legal Principles

"The rules regarding the admissibility of evidence are well established.  Only relevant evidence is admissible.  (Evid. Code, § 350.)  Evidence is relevant if it has 'any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  (Evid. Code, § 210.)  'The test of relevance is whether the evidence tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.  [Citations.]  The trial court retains broad discretion in determining the relevance of evidence.' [Citations.]"  (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 995.)
"In general, the ' "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense."  [Citations.]'  [Citations.]  We have recognized, however, that Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense.  [Citation.]"  (*People v. Cunningham*, *supra*, 25 Cal.4th at pp. 998–999.)  "Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right.  [Citation.]  Accordingly such a ruling, if erroneous, is 'an error of law merely,' which is governed by the standard of review announced in *People v. Watson* (1956) 46 Cal.2d 818, 836.  [Citation.]"  (*Id*. at p. 999.)

## 2. **iPhone Audio**

### a. *Proceedings*

During the investigation of the collision, officers obtained surveillance video from a boathouse close to the collision site (the boathouse video). The boathouse video depicted cars driving on Triunfo Canyon Road soon after the collision occurred. It did not depict the collision or the collision site. During the investigation, Sheriff's deputies recorded part of the boathouse video on an iPhone (the iPhone video). The iPhone video included audio of deputies talking in the background (the iPhone audio) as the iPhone recorded the boathouse video.

Prior to trial, the People moved to exclude the iPhone audio, arguing that any statements made in the iPhone audio were hearsay. The People asserted that the defense should be precluded from mentioning those statements in opening or closing arguments unless defense counsel could make a proffer to explain the basis for the iPhone audio's admissibility.

Grossman filed a response in which she opposed exclusion of the iPhone audio on the basis that comments made by one of the deputies could be relevant to explain the footage, prove the investigators' state of mind, and impeach the deputies.

At a hearing on the matter, defense counsel argued that the prosecution should be required to object to specific statements if they wished to exclude the iPhone audio. Counsel argued that the iPhone audio was relevant to the "presence and impressions of the investigating officers[,]" and that the audio demonstrated the investigators' state of mind and the "lackluster" character of the investigation.

120

The prosecutor replied that the People did not seek to admit any of the iPhone audio and were asserting that all statements in it were hearsay.  It was incumbent upon defense counsel to identify statements that the defense believed to be admissible.

The trial court agreed with the People and instructed the defense to identify any statements it wished to have admitted for the court to review prior to the next hearing.

Defense counsel did not identify any statements for admission, and the issue was not revisited until the defense's accident reconstruction expert, Justin Schorr, testified.  Schorr observed that although it was difficult to see, he believed the boathouse video showed that a car travelling behind Grossman swerved to avoid Mark.  The car behind the car that swerved then struck Mark, pushing his body to the left side of the road.  Schorr opined that anyone using Mark's final resting place to calculate Grossman's speed at the time of impact would be "absolutely off."  Schorr testified that "the fact of somebody watching this video was important to [his own] analysis[,]" which depended on the location of Mark's body after he was first hit.

The prosecutor objected that the deputy's statements were the subject of an earlier evidentiary hearing.  The trial court held a sidebar with counsel to discuss the matter.  The court asked defense counsel what he was attempting to establish.  Counsel responded that the original boathouse video had been deleted.  The deputies who were recording that video had the best vantage

121

point.  One of the deputies said:  " 'That car swerved to miss that kid and the car right behind it went right over the kid.' "[18]

The court found that the deputy's statement was hearsay and not relevant. The defense had not identified the basis for the deputy's statement.  The court invited counsel to bring the deputy in as a witness and question him.

Defense counsel argued that the deputy was watching the boathouse video, so the iPhone audio was admissible as a "present sense impression."

The court stated that the deputy was not watching a video of the collision.  The boathouse video showed cars traveling on the roadway after the collision took place.  Additionally, there was no evidence that the deputy was an expert.  The statement was complete speculation.

Defense counsel argued that Mark's final resting place formed the basis for all the estimates of Grossman's speed at the time of the collision, so anything that caused Mark's body to move after Grossman struck him impacted that calculation.  Schorr had relied on the deputy's statement.  Experts could rely on hearsay.

The prosecutor responded that the statement was inadmissible case-specific hearsay.  Regardless, Schorr was relying on the hearsay statements of a non-expert.  Pursuant to the Supreme Court's decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), experts could not testify regarding case-specific hearsay.  The deputy's statements were speculative and unfounded.

---

[18] Because the defense never filed a motion seeking to have the iPhone audio admitted, the deputy's statements are not contained in the record.

Defense counsel asserted that the loss of the original boathouse video had placed the defense in a bad position.

The trial court responded that the defense had elicited testimony about the loss of the original boathouse video many times during the trial. The basis for the deputy's statement was unknown; the statement was therefore inadmissible.

### b. *Legal Principles*

"Hearsay is an out-of-court statement offered to prove the truth of its content." (*People v. Valencia* (2021) 11 Cal.5th 818, 831; see Evid. Code, § 1200, subd. (a).) "Hearsay is generally inadmissible unless it falls under an exception." (*Sanchez, supra,* 63 Cal.4th 665, 674; see Evid. Code, § 1200, subd. (b).) We review a trial court's evidentiary rulings, including "its determination of issues concerning the hearsay rule," for an abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 590.)

As pertinent here, "[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."  (Evid. Code, § 1240.)

### c. *Analysis*

On appeal, Grossman argues that the deputy's statement should have been admitted as a spontaneous statement pursuant to Evidence Code section 1240.  The People respond that Grossman failed to preserve this argument by not objecting

123

pursuant to Evidence Code section 1240 in the trial court. Alternatively, the People argue the claim must be rejected because the iPhone audio is not contained in the record. Moreover, no witness testified regarding the iPhone audio to create a foundation for its admission. The deputy's statement was unsupported and speculative. Finally, the People assert that Schorr was prohibited from referring to the deputy's statement under *Sanchez*, because it was case-specific hearsay.

We agree with the People. Grossman failed to preserve this argument by not objecting on the specific ground in the trial court. (*People v. Raley* (1992) 2 Cal.4th 870, 892 [" 'questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal' "].) Regardless, the contention lacks merit.

Grossman failed to meet the foundational requirements of Evidence Code section 1240. We cannot review the statement because it is not contained in the record. Even if we could review it, we would have no basis to believe the person speaking was responding to the surveillance video rather than some other event or evidence, absent testimony to that effect. There is simply no foundation for admitting the audio recording.

Finally, we agree with the People that Schorr was not permitted to testify regarding the deputy's statement even if he did rely on it. In *Sanchez*, our Supreme Court held that "[w]hen any expert relates to the [trier of fact] case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay." (*Sanchez, supra*, 63 Cal.4th at p. 686.) The defense sought to admit the deputy's statement and/or elicit Schorr's

124

testimony regarding the statement for the purpose of establishing that Mark's body was moved further away from the point of impact when he was struck by a second car, and for establishing that Schorr's speed calculations took that later movement into account—it was case-specific hearsay that the defense sought to admit for its truth and therefore inadmissible.

### 3.    Expert Testimony on Police Practices

Prior to trial, the prosecution filed a motion seeking to exclude the testimony of defense expert Scott DeFoe regarding law enforcement practices when conducting criminal investigations.  The People argued that the testimony would not negate an element of the charges against Grossman, and that Grossman was on trial, not the Sheriff's Department.  The testimony would only serve to inflame the jury.  Finally, the prosecution could only speculate as to what DeFoe's testimony would be, as the defense had not furnished his report to the prosecution.

Grossman filed an opposition to the motion to exclude DeFoe's testimony.  The motion stated:  "This case will rely heavily on the testimony of investigating officers, including testimony from Deputy McGee on the light conditions, Deputy Curry on his analysis of crash-data retrieval data, Officer Smith on his inspection of Mrs. Grossman's car, Deputy Mejia on his observations at the accident scene, Deputy Kelley on the DUI investigation, Deputy Apodaca on his 'speed analysis,' and Deputy Shean on the process and results of his investigation."  Grossman intended to offer DeFoe's testimony as impeachment of each the aforementioned officers on these subjects.  The defense

125

stated that it planned to show the deputies' motives and biases by exposing their "unreasonable investigative decisions" and explaining "why those decisions undermine the results of the investigation[.]"

At a hearing on the matter, the trial court questioned defense counsel regarding counsel's failure to provide a report to the prosecution. Counsel stated that he had given the prosecutor a paragraph describing the substance of DeFoe's anticipated testimony, and would furnish a report if the court ordered him to do so. Counsel articulated the substance of DeFoe's anticipated testimony to the court as follows: "[E]vidence was moved, the entire investigation was terribly done, according to Mr. DeFoe, the worst that he's seen in more than 35 years of being an individual who is involved in these types of matters."

The court excluded the evidence under Evidence Code section 352. The court found that police practices generally were not a proper subject of expert testimony—whether an expert thought an investigation was reasonable was irrelevant and had the potential to cause confusion and undue prejudice. Defense counsel could expose problems in the investigation through cross-examination of the deputies regarding how they conducted their investigation, and could argue to the jury that the investigation was flawed.

The trial court did not abuse its discretion. The "police practices" that the defense stated DeFoe would testify to in the opposition to the People's motion covered a broad range of subject matter, including light conditions, analysis of crash-data retrieval data, inspection of Grossman's car, observations at the accident scene, the DUI investigation, and " 'speed analysis.' " Defense counsel presented DeFoe as "an individual who is

involved in these types of matters [for 35 years]." The trial court's decision that the Sheriff Department's conduct of the investigation as a whole was not an appropriate subject of expert testimony was not arbitrary or capricious. (See *People v. Brown* (2016) 245 Cal.App.4th 140, 165, fn.9 ["there is no such 'field' as 'police policies and practices.' . . . [a phrase that] is so broad as to be devoid of meaning. It is like declaring an attorney an expert in the 'law' "].) Moreover, the trial court did not abuse its discretion by concluding that introduction of such evidence would confuse the issues and cause undue prejudice by turning the trial into an inquiry regarding every aspect of the investigation— issues upon which both parties would likely offer extensive evidence.

Grossman was not deprived of the opportunity to demonstrate the flaws in the Sheriff's Department's investigation. Counsel cross-examined all of the prosecution's witnesses vigorously. For example, counsel elicited Deputy Mejia's testimony that: the deputy was unaware that a bystander had moved evidence at the scene, which undermined the accuracy of his report; multiple cars drove through the scene of the collision but were never investigated; no one photographed the evidence for at least an hour following the collision; and the only photo of Zachary's scooter in the crosswalk was taken by a bystander. Deputy Mejia testified "[T]hings are delegated, and mistakes are made. I can't explain why." Counsel also elicited Deputy Kelley's testimony that he "inadequately administered" Grossman's FST test. Prosecution expert John Grindey testified that the Sheriff's Department failed to preserve the raw footage of the boathouse video and failed to preserve four of the eight pieces of debris found at the collision site. In closing argument

127

defense counsel emphasized many flaws that undermined the integrity of the Sheriff's Department's investigation, and argued that the deputies were unfairly and inappropriately focused on Grossman as a suspect. This was simply not a situation in which Evidence Code section 352 "must yield" in order to preserve a defendant's right to due process. (*People v. Cunningham*, *supra*, 25 Cal.4th at pp. 998–999.)

### 4. <u>Expert Testimony on Road Design</u>

Grossman contends that the trial court abused its discretion by refusing to admit the testimony of road design expert William Kunzman that the intersection where the collision occurred was "extremely dangerous, poorly engineered, and ill advised" as well as evidence that, after the collision, a traffic light was installed at the intersection where the collision occurred. The argument is without merit.

#### a. *Legal Principles*

"It has been repeatedly held that contributory negligence is not available as a defense or excuse for crime." (*People v. Rodgers* (1949) 94 Cal.App.2d 166, 167.) "[A] defendant whose conduct was a proximate cause of harm is not absolved of responsibility because another person's conduct, negligent or otherwise, is also a substantial or contributing factor in causing the harm." (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1328.) "In criminal prosecutions, the contributing negligence of the victim or a third party does not relieve the criminal actor of liability, unless the victim's or third party's conduct was the *sole* or *superseding* cause

of the death.  [Citations.]" (*People v. Autry* (1995) 37 Cal.App.4th 351, 360.)

" ' "A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause.  If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability." [Citations.]  Thus, it is only an unforeseeable intervening cause, *an extraordinary and abnormal occurrence*, which rises to the level of an exonerating, superseding cause.' [Citation.]" (*People v. Morse* (1992) 2 Cal.App.4th 620, 639; *People v. Brady*, *supra*, 129 Cal.App.4th at pp. 1335–1336; *People v. Schmies* (1996) 44 Cal.App.4th 38, 49–58.)  Moreover, "[a]n 'intervening' or 'superseding' cause which relieves the criminal actor of responsibility is one which 'breaks the chain of causation' *after* the defendant's *original* act," and defendant's act is no longer a substantial factor in producing the injury.  (*People v. Autry*, *supra*, 37 Cal.App.4th at p. 361; *People v. Wattier* (1996) 51 Cal.App.4th 948, 953.)

#### b.     *Proceedings*

Prior to trial, the prosecution moved to exclude evidence of contributory negligence, including testimony of the proposed defense expert William Kunzman regarding road design, because evidence of contributory negligence is not admissible in criminal prosecutions.  Grossman filed an opposition to the motion in which she argued that she sought to present evidence and expert testimony on the issue of proximate causation, not contributory negligence.  Grossman asserted that the road where the collision

129

occurred was dangerously designed, and the crosswalk was dimly lit and placed behind a blind curve on an arterial road where the speed limit was 45 miles per hour.  Grossman argued that these factors played a role in causing Mark and Jacob's deaths.

At a hearing on the matter, the trial court stated that the defense could present evidence on the road conditions on the day of the collision, but not expert testimony that the road was poorly designed, that the city of Westlake knew of the road's poor design, or that Westlake took remedial measures after the collision. The trial court ruled that it would permit evidence of characteristics like visibility and signage, but the defense could not present evidence comparing those conditions to the conditions on other roadways.  The court ruled Kunzman's testimony regarding road design inadmissible.  The court stated that it would reconsider whether Kunzman could testify if the defense made a proffer consistent with the court's ruling.

c. *Analysis*

Although Grossman asserts evidence that the intersection where the collision took place was "extremely dangerous, poorly engineered, and ill advised" is admissible, she offers no substantive argument to support her assertion.  She has therefore waived these challenges. (*Meridian Financial Services, Inc. v. Phan, supra*, 67 Cal.App.5th at p. 684 [this court will not develop an appellant's arguments; undeveloped, unsupported arguments are waived]; see also Cal. Rules of Court, rule 8.204(a)(1)(B) [briefs must "support each point by argument and, if possible, by citation of authority"].)

130

Grossman's sole remaining argument is that California courts have held admissible evidence of remedial measures because the measures were relevant to causation. Fundamental features of the cases Grossman cites undermine her argument that case law supports admission of evidence of remedial measures in this case. First, all of the cases Grossman relies upon concerned civil liability, not criminal liability—comparative negligence is relevant in the civil context, but not in criminal cases. (*Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1326 (*Alpert*); *Baldwin Contracting Co. v. Winston Steel Works, Inc.* (1965) 236 Cal.App.2d 565, 573 (*Baldwin Contracting Co.*); *Dow v. Sunset Telephone & Telegraph Co.* (1910) 157 Cal. 182, 188 (*Dow*).) Second, the evidence in the cited cases was of remedial measures *taken by the parties*, and not *a third party*, such as the city of Westlake as Grossman proposed here. (*Alpert, supra,* 81 Cal.App.4th at p. 1326 [evidence of measures taken to remediate sidewalk defect were admissible as evidence of defendant's knowledge of the defect, control over the property, and causation in trip and fall action]; *Baldwin Contracting Co., supra,* 236 Cal.App.2d at p. 573 [evidence that protective barricade was installed after the accident was admissible as evidence of plaintiff's duty on the job and the feasibility of eliminating the cause of the accident]; *Dow, supra,* 157 Cal. at p. 188 [witness's testimony that he separated telephone wire and electrical wire that had come into contact was admissible to show defendant telephone company's wire was a dangerous condition that existed prior to and during accident, and was the cause of accident].) The situations are not analogous. Moreover, Grossman was not deprived of the opportunity to present evidence of the conditions present at the

131

intersection when the collision occurred, including lighting, curves in the road, signage, and features of the crosswalk.

## J.  *Victims' Vulnerability as an Aggravating Factor*

Grossman contends that the trial court incorrectly applied the aggravating factor that the victims were particularly vulnerable because there was no evidence that she deliberately took advantage of the victims' vulnerability.  We disagree.  A victim may be particularly vulnerable based on the circumstances or their own characteristics, regardless of whether the perpetrator deliberately took advantage of the victim's vulnerability.  In this case, Mark and Jacob were particularly vulnerable due to their youth.

### 1.  Proceedings

The information included the aggravating factor that, as to all counts, pursuant to Rules of Court, rule 4.421, subdivision (a)(3), the victims were particularly vulnerable.

Prior to a bench trial on the aggravating factors, Grossman filed an objection to application of Rules of Court, rule 4.421, subdivision (a)(3).  Grossman argued that, within the meaning of Rules of Court, rule 4.42l, subdivision (a)(3), " 'a "particularly vulnerable" victim is one who is vulnerable "in a special or unusual degree, to an extent greater than in other cases." [Citation.]' " (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 558.)  In *People v. Piceno* (1987) 195 Cal.App.3d 1353,1358 (*Piceno*), the court held that, by definition, all victims of vehicular homicides are particularly vulnerable.  The vulnerability of a

132

victim of vehicular homicide must be distinctly worse than the ordinary particular vulnerability before the court can apply the aggravating factor.  (*Ibid*.)

At a bifurcated bench trial, the prosecutor argued that Mark and Jacob were particularly vulnerable as young children. Their mother was leading them across the street inside a crosswalk—an area that they believed to be safe.  Children have a reduced awareness and ability to perceive danger compared to adults.  Nancy was able to grab her youngest child and carry him to safety.  In contrast, Mark and Jacob had no advance warning and were unable to get out of the way of Grossman's car, which was moving at great speed.

Defense counsel argued that no evidence was presented at trial to demonstrate that the children felt safe in the crosswalk. Counsel further argued that, pursuant to *Piceno*, all victims of vehicular homicide are particularly vulnerable, so the finding cannot be based on the fact that a victim was killed by a car. Counsel claimed there was nothing particularly vulnerable about a child in a vehicular homicide case.

The trial court ruled:  "I agree with the defense, that the case law suggests that vehicular manslaughter and murder involving a pedestrian collision, the fact that a pedestrian victim was in the crosswalk alone does not make them particularly vulnerable and the [*Piceno*] case cited by the defense and other cases recognize that.

"They recognize that by definition victims of vehicular homicides are vulnerable; however, the cases recognize that additional [f]acts may support a finding that the victims were particularly vulnerable; so emphasis on the record [sic] 'particularly vulnerable.'  And as defined in vulnerable and a

133

special or unusual degree to an extent greater than other cases, and the court does believe such facts exist on this case as the People pointed out.

"This is what I relied upon. The victims were minors. They were on skateboards and roller blades, and they had no advance warning or ability to attempt to avoid the defendant's vehicle.

"So there were facts on this case that are aggravating with respect to this allegation that [are] above and beyond just the victims being on the crosswalk."

At the sentencing hearing, the trial court imposed the upper term of six years in count 3, based on its finding that the victims were particularly vulnerable pursuant to Rules of Court, rule 4.421, subdivision (a)(3).

### 2.   **Analysis**

Grossman relies on *Piceno*, *supra*, 195 Cal.App.3d 1353, to support her argument that there were no circumstances in this case that made Mark and Jacob more vulnerable than any other victim of vehicular homicide. In *Piceno*, a pedestrian who was standing 20 feet away from the road against a concrete wall was killed when the inebriated defendant drove off the road and hit him. (*Id.* at p. 1355.) The Court of Appeal held that the trial court erred in applying the particularly vulnerable factor. (*Id.* at p. 1357.) Although there could be no doubt that the victim was vulnerable "if vulnerability is defined as a defenselessness against the crushing power of an out-of-control and speeding car[,]" for the aggravating factor to apply "[his] vulnerability [must] be distinguished from that of all other victims killed by drunk drivers." (*Ibid.*) The *Piceno* court held that " '[f]elony

134

drunk driving *presupposes* an entirely innocent and unsuspecting victim . . . .  [Citation.]  The element of vulnerability is inherent in the very crime of vehicular manslaughter caused by a driver under the influence of alcohol, and to use that factor to aggravate the term is improper, absent 'extraordinary' circumstances.  [Citation.]" (*Id*. at p. 1358.)  The court also observed that "the drunk driver does not seek to take deliberate advantage of the vulnerability of victims, unlike the situation in other criminal cases." (*Ibid.*)

Since *Piceno*, courts have upheld application of the particularly vulnerable aggravating factor in vehicular homicide cases.  In *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1308 (*Weaver*), the court upheld application of the particularly vulnerable aggravating factor where the victims were hit head on by a drunk driver speeding down the highway in the wrong direction with her headlights off.  The appellate court reasoned that "one can envision many situations involving gross vehicular manslaughter . . . in which the victim has at least some advance notice or warning of the imminent risk posed by the defendant's car, thereby allowing him or her at least some opportunity to attempt to avoid the collision." (*Id*. at p. 1316.)  The court held the victims "were *particularly* vulnerable because they, apparently unlike 'usual' victims of gross vehicular manslaughter, had absolutely no advance warning or ability to attempt to avoid the oncoming car." (*Ibid*.)

More recently, in *People v. Mendez-Torres* (2025) 113 Cal.App.5th 1007, 1022 (*Mendez-Torres*), the Court of Appeal found the victim—who had parked his truck upon hearing sirens and was exiting his vehicle when the defendant crossed over the lane and hit him at high speed—particularly vulnerable.  The

court reasoned that the victim "had no realistic opportunity to avoid the collision." (*Ibid*.) Although the defendant did not take a " 'cheap shot' like the defendants in other criminal cases with particularly vulnerable victims, [the victim] was still particularly vulnerable because he was more unguarded and defenseless than the typical victim of a DUI at the time of the collision." (*Ibid*.)

"We review an aggravating factor finding for substantial evidence." (*Mendez-Torres*, *supra*, 113 Cal.App.5th at p. 1020.) This case is analogous to *Weaver* and *Mendez-Torres*, but here the victims were even more vulnerable because of their personal characteristics. Mark and Jacob were 11 years old and eight years old, respectively. They were not yet of an age to have the awareness and vigilance of an adult. Their mother, the only adult who was in the intersection right before the collision took place, was able to pull their three-year-old brother Zachary to safety. Mark and Jacob did not have any warning to permit them to escape. Grossman drove through the crosswalk at a speed of 73 miles per hour, killing them both. It was not necessary for Grossman to deliberately take advantage of the boys' vulnerability for the aggravating factor to apply. Their youth and the associated reduced ability to perceive danger in comparison to an adult is substantial evidence of their particular vulnerability in comparison to other victims of vehicular homicide.

## K.  *Juror Identifying Information*

Finally, Grossman contends that the trial court abused its discretion by ordering the defense not to make use of confidential juror information to attempt to contact jurors without following the procedures for release of juror personal identifying

136

information pursuant to Code of Civil Procedure section 237, and to destroy any such information already in their possession or the possession of their agents.  This contention also lacks merit.

### 1.    Legal Principles

"Upon the recording of a jury's verdict in a criminal jury proceeding, the court's record of personal juror identifying information of trial jurors, . . . consisting of names, addresses, and telephone numbers, shall be sealed until further order of the court as provided by [Code of Civil Procedure] section [237]." (Code Civ. Proc., § 237, subd. (a)(2).)  "Pursuant to Section 237, a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose."  (Code Civ. Proc., § 206, subd. (g).)

"Under Code of Civil Procedure section 206, jurors have the prerogative of agreeing or declining to discuss the case after trial with the parties.  'Nothing in section 206 compels a reluctant juror to speak with any of the parties, their counsel, or investigators.  "If any juror refuses to consent, that is the end of the matter." ' [Citation.]"  (*People v. Russell* (2017) 9 Cal.App.5th 1050, 1057.)  "Jurors often wish to keep their contact information confidential.  ' "Discovery of juror names, addresses and telephone numbers is a sensitive issue which involves significant, competing public-policy interests." ' [Citations.]"  (*Ibid.*)

"Sections 237 and 206 were enacted 'to balance the interests of providing access to records of juror identifying

137

information for a particular, identifiable purpose against the interests in protecting the jurors' privacy, safety, and well-being, as well as the interest in maintaining public confidence and willingness to participate in the jury system.' [Citations.]" (*People v. Russell*, *supra*, 9 Cal.App.5th at p. 1057.) " 'Trial courts have broad discretion to manage these competing interests by allowing, limiting, or denying access to jurors' contact information. [Citations.]' [Citation.]" (*Ibid*.)

### 2. **Proceedings**

About two weeks after the jury rendered its verdict, the trial court informed the parties that two jurors had contacted the court's judicial assistant to report that private investigator Paul Stuckey had attempted to contact three jurors at their homes. The court reminded the parties of their obligations with respect to jurors' personal identifying information pursuant to Code of Civil Procedure sections 206 and 237.

The prosecution filed a motion with the court alleging that the defense contacted jurors in violation of Code of Civil Procedure section 206 and requesting that the court order the defense to relinquish all personal identifying information of jurors. When Stuckey contacted jurors, he had identified himself as "a private investigator for the family." However, it appeared that the defense, and not the family, had employed Stuckey, and that Stuckey had not properly identified himself in compliance with the statute.

Additionally, it appeared that Stuckey utilized improperly obtained juror identifying information to attempt to contact the jurors. The court had ordered juror identifying information

138

sealed following the verdict pursuant to Code of Civil Procedure section 237, subdivision (a)(2), and the defense had not moved for access to the information as required. The People argued that the only way the defense could have obtained the information was by either photographing the list of jurors' names that had been provided to the parties by the court for use during voir dire or by writing down the information on that list. The court specifically advised the parties that the list of jurors' names was confidential and was not to be removed from the courtroom or disseminated. The defense had contravened the court's orders in violation of Code of Civil Procedure section 237. The People sought an order of the court requiring the defense to relinquish all juror personal identifying information and to delete any stored information immediately, as well as an admonishment and sanctions. Three days later, the prosecution filed a supplemental motion informing the court that a juror sent an email to the prosecutor stating that he had been contacted at his home by an investigator who said that he was working for the Grossman family.

At a hearing on the matter, defense counsel informed the court that the defense had retained Stuckey to contact jurors and determine whether there was a basis for a motion for new trial. Counsel had advised the attorney handling the motion for new trial of the court's email regarding juror contact, and the attorney stated that she went over Code of Civil Procedure section 206 with Stuckey. After that, counsel decided not to contact jurors further. There had been no attempted contact with jurors since the court's email.

The court stated that the defense could seek release of juror personal information for purposes of developing a motion for new

trial following the procedures in Code of Civil Procedure sections 206, subdivision (g), and 237.  Absent a grant of a petition made to the court, however, the court prohibited any use of the jurors' names that the court provided in voir dire.  The court made it very clear that the jurors' names provided in voir dire were confidential, and that they were not to be removed from the courtroom or copied.  The court's judicial assistant collected the lists at every recess and adjournment.  The court also clearly advised the parties that jurors' names were provided for the purpose of jury selection and for no other use.  Following the verdict, the court ordered sealed all juror identifying information, including names.  The investigator's use of that information was a violation of Code of Civil Procedure section 206.

Additionally, the investigator had not properly identified himself, in violation of Code of Civil Procedure sections 206, subdivision (c).  Stuckey should have disclosed that he represented the defendant or the defense, as well as the subject of the interview, and the jurors' option to decline to speak with him.  The court emphasized that it had informed the jurors that they would have a chance to be heard by the court if there was a request for release of their personal information, and that protecting juror privacy was an important issue of public policy.  When approached by Stuckey at their homes, the jurors' "sense of privacy [was] upended" and "they weren't pleased."

The trial court took into account that the investigator did not harass any jurors and left when they declined to speak with him, but the court still considered the defense's use of the juror information to be a potential violation of important policies.  The court believed it had discretion to impose monetary sanctions, but declined to do so.  Rather, the court ordered the defense and their

140

agents to destroy any records of juror personal identifying information, and to inform anyone to whom they had disseminated the information that they had done so in violation of a court order and that the information must be destroyed and not disseminated further.  The court observed that, although the matter appeared to be moot in light of the defense's decision not to initiate further contact with jurors, the court would order the defense not to contact jurors going forward unless they made a motion in compliance with Code of Civil Procedure sections 237.

### 3.    Analysis

Grossman argues that the defense was not required to follow the provisions of Code of Civil Procedure section 237 to obtain lawful release of juror identifying information before contacting jurors because the defense used "juror information [already] in counsel's possession."  Grossman does not deny that counsel used information obtained from the confidential list of jurors' names that the court provided for purposes of voir dire.  Instead, she claims that she may utilize the information because counsel committed the confidential information to memory.

Grossman's argument that she may use confidential juror information because "counsel's *memories* cannot be deleted" is preposterous.  There is no "memorization" exception to an order of the court that information is confidential, not to be disseminated, and for use for purposes of voir dire only.  As counsel well knew, the court's order concerned both the document that the court provided to counsel and the information contained therein.  Counsel was obligated to comply.  We likewise find extraordinary the "dilemma" Grossman proposes in the opening

141

brief—that if counsel became aware of potential juror misconduct the court's order would prevent counsel from further investigating and/or filing a petition to unseal juror information because counsel could not use a juror's name. As the People observe, it is not necessary that a juror's name be used in a petition to unseal juror information. The defense need only inform the court of its concern that a juror committed misconduct during trial. A juror may be identified by number in the petition to unseal, if necessary. A trial court is able to determine without reference to a specific name whether the potential misconduct constitutes good cause sufficient to warrant release of juror personal identifying information.

We also reject Grossman's contention that Code of Civil Procedure section 237, subdivision (a)(2) is intended to prevent *the public* from accessing the juror personal identifying information, and not *the defense team*. Grossman did not make this argument in the trial court, and has therefore forfeited it on appeal. (*People v. Viray*, *supra*, 134 Cal.App.4th at p. 1208 [defendant must make a timely and specific objection to preserve an issue for appellate review].) Regardless, the argument does not aid Grossman. Here, the court provided defense counsel a confidential list of jurors' names and clearly ordered counsel not to disseminate it or to utilize the information for any purpose other than voir dire. The order was not lifted after trial ended. Counsel's dissemination and use of juror personal identifying information obtained from the court's confidential list of jurors' names violated the court's order. The court did not abuse its discretion by ordering the destruction of confidential information wrongly in the possession of the defense or its agents, or in

prohibiting contact with jurors absent a petition, filed in conformance with Code of Civil Procedure section 237.

## DISPOSITION

The trial court's judgment is affirmed.
NOT TO BE PUBLISHED.

MOOR, J, Acting P. J.

WE CONCUR:

KIM (D.), J.

KUMAR, J.[*]

---

[*] Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.